91 So.2d 795 (1957)
Warwick J. HAYES and his wife, Olive Hayes and M. Parker Abbott and his wife, Esther S. Abbott, Appellants,
v.
J. Warren BOWMAN, Richard H. Misener and L. Carle McEvoy, Jr., Appellees.
Supreme Court of Florida. Special Division A.
January 4, 1957.
*796 Lindsey & Cargell, St. Petersburg, for appellants.
Henry Esteva, St. Petersburg, for appellees.
THORNAL, Justice.
Appellants Hayes and Abbott, who were plaintiffs below, seek reversal of a final decree of the Chancellor in a declaratory judgment proceeding involving alleged riparian rights of the parties in the tidal waters of Boca Ciega Bay.
Although many incidental questions are propounded, the determining point is whether a fill proposed by the appellees would, when constructed, encroach upon the common law riparian rights of appellants.
An understanding of the opposing contentions will be assisted by a drawing of the land and proposed fill, all of which is set out as follows:
*797 
*798 Prior to the institution of this suit appellees and their predecessors were owners of a portion of the mainland on the western shore of Boca Ciega Bay. They acquired a parcel of submerged lands in the Bay from the Trustees of the Internal Improvement Fund. By dredging and filling they built a subdivision known as Brightwater Beach Estates shown in the foregoing drawing. The northern tier of lots comprising Block 4 is located on a narrow dredged-in peninsula approximately 1750 feet long in an easterly direction from the mainland toward the Channel. Lots A and B, Block 4, constitute a parcel of land across the eastern extremity of said Block 4. Blocks 1, 2 and 3 are dredged-in "fingers" or peninsulas constructed in a southeasterly direction from the southern boundary line of said Block 4. Block 3 is the easternmost of these three fingers. Appellants' property is Lot 11, Block 3. It is located on the easterly side of the Block. Consequently, the front of appellants' lot faces the waters and Channel of the Bay. The sidelines of appellants' lot run in a generally northeasterly-southwesterly direction.
Appellees own Lots A and B above mentioned. The south line of these lots is about 200 feet north of the northerly line of appellants' lot.
On October 22, 1954, appellees acquired from the Trustees of the Internal Improvement Fund an additional strip of submerged land 270 feet in width extending from the easterly edge of Lots A and B a distance of 2300 feet easterly toward the Channel. Appellees now propose to dredge and fill this newly acquired submerged land. Appellants filed a complaint to enjoin the proposed operation. The Chancellor entered a summary final decree for the appellees. Hence, this appeal seeking reversal of the decree.
It is the contention of the appellants that as upland owners of land bounded by navigable waters they enjoy certain common law riparian rights to an unobstructed view of the Bay, as well as a right of ingress and egress to and from their land over the waters of the Bay from and to the Channel. They contend that these rights exist in an area over the waters of the Bay to be determined by extending their side lot lines in a northeasterly direction to the Channel. They assert that appellees' proposed fill 2300 feet easterly of said Lots A and B toward the Channel would therefore completely bi-sect the corridor over and through which they are entitled to enjoy their riparian rights and reach the Channel. In other words, they contend that the common law riparian rights of an upland owner abutting navigable waters are exclusive against all interference in that area over the waters established by an extension of the side lines of the upland lot to the Channel.
It is the position of the appellees that when the Channel substantially parallels the shoreline the common law riparian rights of the upland owner are to be established in an area measured by lines drawn perpendicularly from the thread of the Channel to the corners of the property of the upland owner. By applying this rule they contend that the construction of the proposed fill would not in any way interfere with the area vouchsafed to appellants for the exercise of their common law rights.
A cautious analysis and a thorough understanding of the nature of the sovereign's proprietorship of submerged lands under tidal waters is suggested by this record. To paraphrase the language of Judge Learned Hand in Jackson & Co. v. Royal Norwegian Government, 2 Cir., 177 F.2d 694, 702, "out of the rivers of ink that have been written on this subject" certain fundamental principles have emerged which are entitled to careful examination and restatement. In our democracy the State's title is in the nature of the sovereign proprietorship as it existed at common law. We must at the same time understand and give due regard to the *799 littoral and riparian rights of the upland owners. These are appurtenances to private property which are entitled to due recognition and protection. The vital aspect of the problem in Florida is acutely demonstrated when we look to our general coastline of 1197 statute miles and our detailed tidal shoreline, including bays, sounds and other bodies measured to the head of tidewater, which measures 8426 statute miles. See The World Almanac, 1955, p. 258. The expanding importance of the situation is underscored by the enactment of the so-called Submerged Lands Act of 1953 by the Congress of the United States. 67 Stat. 29, 43 U.S.C.A. § 1301 et seq. See State of Alabama v. State of Texas, 1954, 347 U.S. 272, 74 S.Ct. 481, 98 L.Ed. 689. For earlier views of the Supreme Court of the United States, see Shively v. Bowlby, 1893, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331; Skiriotes v. State of Florida, 1941, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193; Toomer v. Witsell, 1948, 334 U.S. 385, 393, 68 S.Ct. 1156, 92 L.Ed. 1460; and contrast United States v. State of California, 1946, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889.
At common law, although admittedly there was some divergence of view, the title to all land under tidal waters below high water mark belonged to the Crown. These waters and the lands which they covered were held by the king in trust for the use of all his subjects. The primary uses were navigation, bathing and fishing. Thus it was that the title, jus privatum, was held by the king as sovereign but the dominion, jus publicum, was vested in him for the benefit of the people. At least from the time of Sir Matthew Hale (1609-1676) this was the accepted rule, except in cases where an individual had acquired rights in the submerged lands by express grant which did not interfere with navigation, and other riparian right such as fishing. Thus arose the doctrine of the so-called "inalienable trust" whereby the sovereign held the legal title for the equitable use of his subjects. See Moore's, History and Law of the Foreshore and Sea Shore.
With the colonization of the Western hemisphere this became the accepted doctrine among the thirteen original states and the territories. Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331; Martin v. Waddell's Lessee, 1842, 16 Pat. 367, 414, 10 L.Ed. 997; Skiriotes v. State of Florida, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193. The rule has been varied slightly in some states by statute.
Subject to certain statutory variations which we hereafter point out, it is well settled in Florida that the State holds title to lands under tidal navigable waters and the foreshore thereof (land between high and low water marks). As at common law, this title is held in trust for the people for purposes of navigation, fishing, bathing and similar uses. Such title is not held primarily for purposes of sale or conversion into money. Basically it is trust property and should be devoted to the fulfillment of the purposes of the trust, towit: the service of the people.
However, consonant with the common law rule, the State may dispose of submerged lands under tidal waters to the extent that such disposition will not interfere with the public's right of navigation, swimming and like uses. Moreover, any person acquiring any such lands from the State must so use the land as not to interfere with the recognized common law riparian rights of upland owners (an unobstructed view, ingress and egress over the foreshore from and to the water). Thiesen v. Gulf, F. & A. Ry. Co., 75 Fla. 28, 78 So. 491, L.R.A. 1918E, 718; Hicks v. State, 116 Fla. 603, 156 So. 603; Pembroke v. Peninsular Terminal Co., 108 Fla. 46, 146 So. 249; State v. Gerbing, 56 Fla. 603, 47 So. 353; State ex rel. Landis v. Rosenthal, 109 Fla. 363, 148 So. 769; Tampa Southern Railroad Company v. Nettles, 82 Fla. 2, 89 So. 223. Upland owners have been *800 granted additional statutory riparian rights which must be recognized. These we mention hereafter.
This power of the State to dispose of submerged tidal lands has assumed important proportions in recent years. Valuable subdivisions have been built on dredged-in fill. Large areas have been leased to those who would speculate in drilling for oil. Increased interest in this type of land bears forebodings of even more complex problems in the future. These lands constitute tremendously valuable assets. Like any other fiduciary asset, however, they must be administered with due regard to the limitations of the trust with which they are impressed. Merrill-Stevens Co. v. Durkee, 62 Fla. 549, 57 So. 428; Martin v. Busch, 93 Fla. 535, 112 So. 274; Brickell v. Trammell, 77 Fla. 544, 82 So. 221; Deering v. Martin, 95 Fla. 224, 116 So. 54.
The custodians of this trust are the Trustees of the Internal Improvement Fund. See Chapter 253, Florida Statutes, F.S.A. Prior to 1951 the Trustees were authorized to sell tidal lands upon which the waters were not more than three feet deep at high tide and which were separated from the mainland by a channel not less than five feet deep at high tide, and also certain sand bars and shallow banks along the mainland. See Chapter 7304, Laws of Florida 1917, Secs. 253.12-253.15, F.S. 1941, F.S. 1949, F.S.A. By Chapter 26776, Laws of Florida 1951, Sec. 253.12, Florida Statutes, F.S.A. title to all sovereignty lands (except in Dade and Palm Beach counties) was vested in the Trustees of the Internal Improvement Fund with power of disposition thereof in the manner provided by the statute. The submerged lands acquired by appellees for purposes of the proposed fill were purchased under this section. We note in passing that the constitutionality of Chapter 26776, Laws of 1951, is not assaulted and we therefore do not pass upon it.
The riparian rights of upland owners of lands bounded by tidal waters in Florida have been expanded by statute. See Chapter 271, Florida Statutes, F.S.A. By Chapter 8537, Laws of 1921, the so-called Butler Bill (deriving its name from its sponsor Senator J. Turner Butler of Duval County), the right of an upland owner to dredge, bulkhead and fill in front of his land to the edge of the channel was provisionally granted to the owners of lands extending to the high-water mark instead of being limited to ownerships which extended to the low-water mark. The privilege did not apply over public bathing beaches. Section 271.07, Florida Statutes, F.S.A. It should be noted that no title is acquired until such submerged lands are actually filled in or permanently improved. Sections 271.01 and 271.08, Florida Statutes, F.S.A. Before this was done, the State's offer to riparian owners for them to secure title by improving the foreshore could be withdrawn and the provisional rights then reverted to the State. Duval Engineering & Contracting Co. v. Sales, Fla. 1954, 77 So.2d 431.
The so-called common law riparian rights of upland owners bordering upon navigable waters have now been expressly recognized by statute. See Section 271.09, Florida Statutes, F.S.A., Chapter 28262, Laws of Florida 1953. See also Adams v. Elliott, 128 Fla. 79, 174 So. 731; Willliams v. Guthrie, 102 Fla. 1047, 137 So. 682; Holland v. Ft. Pierce Financing & Construction Co., 157 Fla. 649, 27 So.2d 76; Freed v. Miami Beach Pier Corporation, 93 Fla. 888, 112 So. 841, 52 A.L.R. 1177; McDowell v. Trustees of Internal Imp. Fund, Fla., 90 So.2d 715.
At the risk of repeating a number of rules heretofore settled we have herewith attempted to summarize the development of state ownership of submerged tidal lands, the power of disposition thereof and the co-relative riparian rights of upland owners. It remains to apply these rules to the case before us.
*801 For purposes of this record we assume that appellants are "upland owners". No question is raised in that regard. It will be recalled that the lot owned by appellants is itself located on dredged-in fill. It is situated in Boca Ciega Bay on the dredged-in subdivision connected with the mainland by the peninsula designated as Block 4 of the subdivision. Trustees of Internal Imp. Fund v. Claughton, Fla. 1956, 86 So.2d 775.
We harken back to the main points made by the parties. Appellants claim that they are entitled to an unobstructed view toward the Channel over a corridor measured by extending their northeasterly-southwesterly lot lines directly to the Channel. Appellees claim that this corridor is to be bounded by imaginary lines drawn at right angles from the thread of the Channel to the corners of appellants' lot. If appellants' contention is approved, the proposed fill would obstruct their view. If appellees' position is adopted, there would be no obstruction.
It is absolutely impossible to formulate a mathematical or geometrical rule that can be applied to all situations of this nature. The angles (direction) of side lines of lots bordering navigable waters are limited only by the number of points on a compass rose. Seldom, if ever, is the thread of a channel exactly or even approximately parallel to the shoreline of the mainland. These two conditions make the mathematical or geometrical certainty implicit in the rules recommended by the contesting parties literally impossible. We must therefore search elsewhere for a solution to this admittedly difficult problem. We find our answer at least suggested by the language of Section 271.01, Florida Statutes, F.S.A. granting bulkheading privileges to upland owners " in the direction of the channel, or as near in the direction of the channel as practicable to equitably distribute the submerged lands * * *." Added legislative support for this notion is contributed by the fact that Section 271.09, Florida Statutes, F.S.A., does not purport to define or delineate the exact area over which the so-called common law riparian rights are to be enjoyed.
We are therefore of the view and must hold that the common law riparian rights to an unobstructed view and access to the Channel over the foreshore across the waters toward the Channel must be recognized over an area as near "as practicable" in the direction of the Channel so as to distribute equitably the submerged lands between the upland and the Channel. This rule means that each case necessarily must turn on the factual circumstances there presented and no geometric theorem can be formulated to govern all cases. An upland owner must in all cases be permitted a direct, unobstructed view of the Channel and as well a direct, unobstructed means of ingress and egress over the foreshore and tidal waters to the Channel. If the exercise of these rights is prevented, the upland owner is entitled to relief.
In the instant case the Chancellor obviously held that the appellees had not encroached upon or threatened to encroach upon appellants' right of view or right of approach to the Channel of Boca Ciega Bay. We agree with the Chancellor. The appellants still have a direct, unobstructed view of the Bay "in the direction of the Channel" as well as a direct and unobstructed means of ingress and egress to the Channel of the Bay.
It is true as appellants allege that they will be deprived of a view of the "bright, white tower of Stetson Law School which shines as a beacon of learning on the eastern horizon." We are nonetheless impelled to the thought that a view of that splendid institution of learning, so ably headed now by a former member of this Court, is not a special riparian right guaranteed to appellants and those similarly conditioned.
In Freed v. Miami Beach Pier Corporation, supra, the late Justice Whitfield, who many times wrote the view of this Court on the subject at hand, pointed out that *802 the shore line and the channel may not run in the same direction and the boundary lines of lands that extend to the shore line may not run at right angles with the shore line. He then added that these conditions tender questions as to rights of riparian owners that require the application of appropriate rules to particular facts in each case as it is presented for adjudication.
Riparian rights do not necessarily extend into the waters according to upland boundaries nor do such rights under all conditions extend at right angles to the shore line. Our own precedents are completely inconsistent with the appellees' view that such rights extend over an area measured by lines at right angles to the Channel. It should be borne in mind that littoral or riparian rights are appurtenances to ownership of the uplands. They are not founded on ownership of the submerged lands. It is for this reason, among others that we cannot define the area within which the rights are to be enjoyed with mathematical exactitude or by a metes and bounds description.
We therefore prescribe the rule that in any given case the riparian rights of an upland owner must be preserved over an area "as near as practicable" in the direction of the Channel so as to distribute equitably the submerged lands between the upland and the Channel. In making such "equitable distribution" the Court necessarily must give due consideration to the lay of the upland shore line, the direction of the Channel and the co-relative rights of adjoining upland owners.
We realize that such a rule, like many others in equity, invokes the conscience of the Chancellor in the application of broad principles to the factual situation presented by the particular case. Unlike John Seldon, however, we cannot agree that the standard for the exercise of the Chancellor's conscience is the length of "the Chancellor's foot." It is a judicial determination that he must make in each instance consistent with the rights of the parties presented by the record.
In the case before us the ruling of the Chancellor does no violence to the rights of appellants. They still may enjoy their riparian rights over the waters of Boca Ciega Bay in an area as "near as practicable" in the direction of the Channel with a resulting equitable distribution of the submerged lands and the waters and area above said lands between their upland and the edge of the Channel. It should be made clear that this holding is limited to the effect of the proposed filling of the particular submerged land adjacent to appellees' lots A and B, Block 4, mentioned in our summary of the facts. If the fill should be extended in a southerly direction so as to interrupt appellants' remaining view of or approach to the Channel, appellants might then have substantial grounds for complaint.
It appears to us that our position is strengthened when we take note of the fact that the Trustees of the Internal Improvement Fund are five constitutional officers of the executive branch of the government. If we are ever to apply the rule that public officials will be presumed to do their duty, it would appear to us to be most appropriate in this instance. Certainly we are not to assume that in the supervision and disposition of submerged lands the Trustees will knowingly ignore the rights of upland owners. It is to be assumed that they will exercise their judgment in a fashion that will give due regard to private rights as well as public rights. This Board would appear to be the most appropriate repository of the responsibility to be exercised in these matters in the first instance. The exercise of their judgment should not be subjected to adverse judicial scrutiny absent a clear showing of abuse of discretion or a violation of law. For an interesting and helpful discussion on this entire subject see Tidelands and Riparian Rights in Florida *803 by Melvin J. Richard, Miami Law Quarterly, Vol. 3, Number 3, p. 339, April 1949.
We have considered the other grounds for reversal argued by appellants. We find that the cause was appropriately disposed of by summary decree. The proposed conduct of appellees does not violate the restrictive covenants in the deeds under which they hold title to the upland.
The decree of the Chancellor is 
Affirmed.
DREW, C.J., HOBSON, J., and PEARSON, Associate Justice, concur.