958 So.2d 367 (2007)
Patrick W. BRANNON and Kathryn C. Brannon, Appellants,
v.
Steven W. BOLDT, Mary Anne Pittman, Thomas Brizzi, Saira Brizzi, Dane Disano, Sharon Disano, Harry Gieschen, Cindy A. Gieschen, George Hartman, Mary Hartman, Phyllis Wellman Hainsworth, Tom Holdstein, Nancy Holdstein, Theodore Henter, Mary Henter, Larry Lynch, Robin Roberson, Harold H. Mazhimer, Thelma R. Maxhimer, Allen E. Oster, Suzanne Oster, Helen B. Pond, Steven Sanders, Cynthia A. Sanders, Charles Sciandra, Doris Sciandra, Michael J. Sieber, Rea Sieber, Mark P. Togna, Julianne Martin, and Ruth Vincent, Appellees.
No. 2D03-4477.
District Court of Appeal of Florida, Second District.
January 24, 2007.
Rehearing Denied February 21, 2007.
*368 Richard M. Hanchett and Marie Tomassi of Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A., Tampa, for Appellants.
Henry G. Gyden, John R. Blue, Sylvia H. Walbolt, and Lee H. Rightmyer of Carlton Fields P.A., St. Petersburg, for Appellees.
EN BANC
ALTENBERND, Judge.
This court has elected to review en banc a very narrow, but significant issue:
What rights do the residents in a neighborhood receive, as dominant estate holders under an implied easement created by a denotation on a plat map of an "easement for ingress and egress" to a body of water, when the servient estate is part of a residential lot on which there exists an occupied family dwelling?
The issue in this case arises directly from a dispute over the interpretation of this court's opinion in Cartish v. Soper, 157 So.2d 150 (Fla. 2d DCA 1963). In Cartish, this court considered whether the dominant estate holders of a similar easement received riparian rights that could allow them to rebuild a dock at the water's edge of the servient estate. We held:
Proceeding from the premise, admitted by appellants, that easement rights may be created by implication, it is clear that such riparian rights necessary and incidental to access and egress from the Bay were implicit in the reservation of the Parkway. Just as accreted land would necessarily be burdened by the easement as a necessary implication of the reservation, so too the right to build a dock to facilitate access to the waters is implied.
Accordingly, insofar as riparian rights are necessary to or consistent with the purposes of the easement, they are impliedly granted to appellees and, as a corollary, reserved from the appellant fee owners. Cf. Feig v. Graves, supra; City of Tarpon Springs v. Smith, 1921, 81 Fla. 479, 88 So. 613; Geigor [Geiger] v. Filor, 1859, 8 Fla. 325.
157 So.2d at 153-54.
Unlike the dominant estate holders in Cartish, the lot owners in the neighborhood involved in this case are not primarily seeking to build a dock. Instead, they are seeking the right to sit and stand on the lands within the easement to fish, watch fireworks, watch the sunset, and generally enjoy the view of Boca Ciega Bay. The servient estate  that is, the land subject to the easement  is otherwise owned and occupied by the Brannons, subject to the "easement for ingress and egress" given to the other lot owners by virtue of a notation *369 on the relevant plat map. The Brannons perceive their neighbors to be trespassers on their property when they remain within the easement for periods longer than reasonably necessary to gain access to the water. The neighbors perceive that they have the right to stay within the easement for as long as they wish in order to enjoy their "riparian" rights.
If "good fences make good neighbors,"[1] it is also true that bad easements can make for bad neighborhoods. The judges of this court have struggled to apply the Cartish tests  "such riparian rights necessary and incidental to access and egress" and "necessary to or consistent with the purposes of the easement"  in this case. It appears from the concurring opinion in Cartish that the judges in that case did not resolve the broader issue that faces us today. See 157 So.2d at 154 (White, J., concurring specially). Realizing that there are many neighborhoods in Florida affected by similar plat maps and that confusion in this area of the law can create great friction and hostility within a neighborhood, we have concluded that this matter is one of "exceptional importance" warranting the collective judgment of all active members of this court. See Fla. R.App. P. 9.331(a). We likewise certify to the Supreme Court of Florida the issue stated at the beginning of this opinion as a question of great public importance.

I. THE BASIC LAYOUT OF BAY PARK GARDENS
This case involves a neighborhood that is west of Park Street on 37th Avenue North in St. Petersburg, Florida. Thirty-seventh Avenue essentially dead ends at Boca Ciega Bay. This neighborhood was platted as "Bay Park Gardens" in 1953. It was designed to include twenty-two lots along 37th Avenue North and four tracts of land near the water's edge. The four tracts were designated A, B, C, and D (Appendix A, Plat Map). The original developer was Chestley E. Davis. In 1958, he sold tracts A and B to William and Virginia Norris, who built a personal residence on the two lots. Thus, for all practical purposes, these two tracts have been a single lot since the late 1950s. As explained later, the Brannons now own the home built by the Norrises.
An examination of the original plat map reveals much about Mr. Davis's vision as a developer. None of the lots along 37th Avenue North had direct access to the water. The two most valuable tracts, C and D, each had approximately 100 feet of waterfront with the tracts extending down to the mean high-water mark. Without an easement, there would have been limited ability to have a driveway into tracts C and D, and no ability to reach tracts A and B. Thus the development was platted with a twenty-two-foot-wide easement running north and south at the eastern edge of tracts C and D, primarily to give automobile access to those lots. At the north end of this easement, Mr. Davis designated an easement running east and west. Mr. Davis placed the entire twenty-two-foot east/west easement on tracts A and B, the land he developed for himself (Appendix B, Detail from Plat Map). The entire grant of easement states: "22' easement for ingress & egress and utilities."
If Mr. Davis had only been concerned about motor vehicle traffic, the east/west easement could have ended at the eastern property line of tract B. However, he extended the twenty-two-foot easement to *370 the mean high-water mark. By reference to the plat map in the deeds of all of the lots, the purchasers of those lots were given an easement by implication providing them with ingress and egress to the water at the mean high-water mark. Thus, the purchasers of the lots knew that although they would not own waterfront property, they were purchasing the right to reach the water in a convenient manner.
The vision of developers and the reality of development have often parted ways in Florida. In this case, Mr. Davis built a dock on the easement in 1957 or 1958. He reserved the north side of the dock for the owner of tract B, and he reserved the south side of the dock for the owners of the other lots. The dock was short-lived. It was destroyed by a hurricane in 1960 and was never rebuilt. The Norrises built their home on tracts A and B, positioned so the easement runs down the driveway, adjacent to the garage and very close to their living room and kitchen before it enters the backyard. Thus, at least psychologically, anyone who owns the home on tracts A and B will always have a sense that neighbors are invading their personal space when the neighbors use the easement.
The owners of tracts C and D, as well as Mr. Davis, also built a seawall on this property in 1957 or 1958. Like so many other seawalls, this wall kept the sea out, but it also tended to erode the beach available to the public below the mean high-water mark. Oysters built up adjacent to the seawall. At this time, there is little, if any, public beach below the mean high-water mark at the edge of the easement where any normal person would choose to fish or enjoy a sunset. Thus, the easement now runs to a location of little or no value to someone who holds only public riparian rights.

II. THE FIRST EASEMENT DISPUTE
This case is not the first dispute arising from this easement. When Mr. Davis and his wife conveyed tracts A and B to William and Virginia Norris in 1958, tract C was owned by the Guillaumes. A dispute arose between the Norrises and the Guillaumes when the Norrises built a wall to separate tract C from tracts A and B. Tract C had been developed using a layout that provided no vehicular access to the Guillaumes' backyard except via the easement. Thus, the wall prevented them from accessing their backyard.
On December 5, 1958, a final decree was entered in a lawsuit styled Bernard G. Guillaume & Ethylle Guillaume, his wife, Plaintiffs v. William Norris & Virginia Norris, his wife, Defendants, Chancery No. 48,803, and recorded in the public records of Pinellas County. The Guillaume court stated:
The Court further finds that the plat of Bay Park Gardens was not ambiguous in any respect and that the designation of the 22-foot east-west easement for ingress, egress and utilities created an easement for the benefit of Tract "C" as well as all of the other lots and tracts in the subdivision.
This final decree granted the owners of tract C access down the easement "as is reasonably necessary" to enter their backyard, and it ordered the Norrises to remove a twenty-foot segment of the wall to allow access to tract C. The Norrises and Guillaumes later entered into a stipulation that permitted the owners of tracts A and B to install a gate of their choosing in the twenty-foot opening; however, no owner of those lots has done so.
This earlier lawsuit did not name the other neighbors as parties and did not address what, if any, riparian rights the neighbors may have by virtue of the language *371 on the plat map. Thus, while we agree that the brief phrase, "22' easement for ingress & egress and utilities," is not ambiguous, the earlier lawsuit did not discuss the Cartish test or resolve the nature of the "riparian rights necessary and incidental to access and egress," 157 So.2d at 153, that are at issue in this case.

III. THIS EASEMENT DISPUTE
The Brannons purchased tracts A and B in December 2000. By that time, tracts C and D were no longer owned by the Guillaumes but were owned by Mr. and Mrs. Henter. The Brannons installed two gates across the easement. They placed a security gate across their driveway at the front of the property and a second gate closer to the water that closed off their entire backyard. This gate is locked, rendering a portion of the easement inaccessible to the owners of the other lots in the neighborhood. As a result of these gates, a dispute over the easement erupted again and the entire neighborhood became interested in their rights to the easement.
The Henters and the other lot owners sued and sought a declaration that by virtue of the plat, the owners of the twenty-two lots in the subdivision had an easement by implication across the Brannons' property and that they "own[ed] the right to use the East-West Easement for the purposes of ingress to and egress from Boca Ciega Bay, together with all riparian rights appurtenant thereto." The lot owners' specific argument was that
when the developers of the Subdivision conveyed property rights to create the East-West easement, they also implicitly and inherently conveyed the riparian rights associated with what is now the Brannons' property. Thus, under Florida law . . . they inherently and implicitly gave the landlocked property owners in the Subdivision a . . . wide range of riparian rights.
Thus the lot owners argued that
the entire Subdivision enjoys riparian rights as a result of the easement, [and] all property owners in the Subdivision are permitted to enjoy the normal benefits of the waterfront within that 22-foot easement. Such landlocked "neighbors" may conduct activities such as fishing, boating, and even enjoying an unobstructed view of the water.
The Henters also claimed that they had the right to unobstructed access to their backyard via the easement and that the gate across the driveway constituted an unreasonable obstruction.
Following a lengthy evidentiary hearing, the trial court rejected the Brannons' various defenses and found that the easement was created for the benefit of the owners of tract C to provide vehicular access to and from their backyard and for the benefit of the entire subdivision to provide access to and from the waters of Boca Ciega Bay. The court also found that because the easement provided for ingress and egress over lands reaching navigable waters, it "necessarily conveys the riparian rights associated with those lands." The trial court concluded that these rights included the right to fish, to boat, "and most importantly, as this is the riparian right enjoyed most often by the plaintiff lot owners in this case, to enjoy a clear and unobstructed view over the waters." The trial court also found that the lot owners had the right "to build a properly permitted dock or observation platform," although it apparently is unlikely that such a permit could be obtained at this time in light of strengthened environmental regulations. Finally, the trial court found that the Brannons' driveway gate was an unreasonable obstruction to the Henters' right of passage and ordered it removed. It also *372 placed some restrictions on the manner in which cars can be parked in the driveway.
The Brannons appealed the final judgment. Initially, this court issued a divided opinion in which an associate judge participated in the majority. Brannon v. Boldt, 31 Fla. L. Weekly D1260, 2006 WL 1194283 (Fla. 2d DCA May 5, 2006). The majority affirmed the trial court's final judgment in all respects.
As to the dispute between the Brannons and the Henters concerning access to the Henters' property and the interference of the gates, this court en banc now also affirms that portion of the trial court's judgment without further discussion. Thus, we limit our en banc discussion to the nature and extent of the riparian rights transferred to the lot owners as an easement by implication.[2]

IV. RIPARIAN RIGHTS NECESSARY TO AN IMPLIED EASEMENT
This is not a case involving an express easement where the rights are explained in detail in a recorded document. Instead, it is a case where the easement is implied from the recorded plat map. See, e.g., Tortoise Island Cmtys., Inc. v. Moorings Ass'n, 489 So.2d 22 (Fla.1986), quashing but adopting dissenting opinion in 460 So.2d 961 (Fla. 5th DCA 1984). Thus the issue is not what rights could be transferred to the lot owners in an express easement, but rather what riparian rights must be transferred to the lot owner because they are necessary to or consistent with the purposes of the implied easement.
Riparian rights are rights to use the water.[3]Broward v. Mabry, 58 Fla. 398, 50 So. 826, 829 (1909). There are two categories of riparian rights. Id. at 830. The public has the right to use navigable waters for navigation, commerce, fishing, and bathing and "other easements allowed by law." Id. Owners of riparian land share these rights with the public. Id. The public's right to use navigable waters or the shore derives from the public trust doctrine. See Hayes v. Bowman, 91 So.2d 795, 799 (Fla.1957). The doctrine embodies the common law rule that the sovereign held title to all the land below the high-water mark in trust for the use of the people. Id.
The specific nature of the trust in favor of all the subjects . . . was that those subjects should have the free use of such waters and shores. The waters . . . were of common right, public for every subject to navigate upon and fish in without interruption; . . . the shore was also of common right public. The use of each was in the subjects for the inherent privileges of passage and navigation and fishing, as public rights. . . .
State v. Black River Phosphate Co., 32 Fla. 82, 13 So. 640, 643 (1893); see also Hayes, 91 So.2d at 799 (noting that the principle uses of the water were navigation, bathing, and fishing).
*373 Private riparian rights to navigable waters are given to those whose land extends to the high-water mark. As explained in Broward:
Those who own land extending to ordinary high-water mark of navigable waters are riparian holders who, by implication of law, and in addition to the rights of navigation, commerce, fishing, boating, etc., common to the public, have in general certain special rights in the use of waters opposite their holdings; among them being the right of access from the water to the riparian land and perhaps other easements allowed by law. These special rights are easements incident to the riparian holdings, and are property rights that may be regulated by law, but may not be taken without just compensation and due process of law.
50 So. at 830. Florida has recognized greater private riparian rights than merely the right of access to and from the water. In Florida and in most other states, riparian owners take title to land added to their property by accretion and reliction. See Bd. of Trustees of the Internal Improvement Trust Fund v. Sand Key Assocs., Ltd., 512 So.2d 934, 936 (Fla.1987). Most notably and apparently unique to Florida, riparian owners have the right to an unobstructed view over the waters. See Thiesen v. Gulf, Fla. & Ala. Ry. Co., 75 Fla. 28, 78 So. 491, 507 (1917); see also Lee County v. Kiesel, 705 So.2d 1013, 1015 (Fla. 2d DCA 1998).
In this case, of course, there is no dispute that all of the parties have public riparian rights in the waters of Boca Ciega Bay. Thus, they are all free to boat and swim in the waters of the bay. If and when accretion were to add a sandy beach below the mean high-water mark in front of the seawall on the Brannons' property, all members of the public could use that beach if they entered from the water, and the residents of this neighborhood would clearly be free to use the easement to gain access to the public beach to fish, watch fireworks, enjoy sunsets, and engage in typical beach activities.
But the current reality is that little or no land exists below the mean high-water mark at the location of the easement. From the record, it appears that the only way to fish or view a sunset from this location would require the use of land above the mean high-water mark and within the easement. This land is owned by the Brannons subject to the easement rights of the lot owners.
Under the holding in Cartish, it is clear that the lot owners have the legal right by virtue of the easement to apply for a permit to place a dock on the edge of the Brannons' property, giving them access to the water. As mentioned earlier, this legal right is apparently illusory at this time because other zoning and environmental regulations may not authorize a dock. The long-existing seawall would make it impossible to launch any sizeable craft from this location, but the lot owners do have a right of access to cross the Brannons' property with a canoe, a small boat, or a floatation device that could be launched over the seawall.
However, the primary right that the lot owners wish to possess is the right to view the water from the land within the easement. If the easement by implication gives them all of the riparian rights of the Brannons, including the right to a view, then there is a good argument that they can view the water, sunsets, and fireworks from this portion of the Brannons' backyard.
We conclude that in the absence of a more elaborate written easement, the purpose of this implied easement is merely to *374 give the lot owners access, i.e., ingress and egress, to the water and to the public riparian rights possessed by all people below the high-water mark. See Feig v. Graves, 100 So.2d 192 (Fla. 2d DCA 1958) (explaining that purpose for which the easement was granted determines the riparian rights necessarily included within such an easement). To achieve that purpose they receive the right to cross the Brannons' property in a reasonable amount of time, but they do not receive the right to fish from or remain on the Brannons' property for extended periods. The right to view the water, albeit a private riparian right, is not a right necessary to or consistent with the purpose of this implied easement.
By way of analogy, we note that this property also borders on a public park. If the easement had been given as an ingress and egress easement to the public park, no one would argue that the lot owners received the right to linger in the easement. They would merely receive the right to cross the easement to reach and enjoy the public park. We conclude that the right of ingress and egress to the location where public riparian rights commence, i.e., the mean high-water mark, is essentially no greater than the right of ingress and egress to an adjacent parcel of land.
In sum, the lot owners have the legal right to build a dock at the water's edge of this easement if otherwise permitted by law. They have the right to cross the property without undue delay to reach any area below the mean high-water mark where public riparian rights exist. They may cross the property to launch any small boat, canoe, or floatation device that can be reasonably launched from the existing seawall. They do not have the right to remain within the easement for extended periods to view the water, fireworks, or the sunset.
Affirmed in part, reversed in part, and remanded.
FULMER, C.J., and NORTHCUTT, CASANUEVA, SALCINES, STRINGER, DAVIS, SILBERMAN, KELLY, CANADY, VILLANTI, JJ.,[4] Concur.
WHATLEY, J., Concurs in part; dissents in part.
WHATLEY, Judge, Concurring in part; dissenting in part.
I concur in part and dissent in part. I concur as to the majority's conclusion regarding the gate issue. I respectfully dissent as to the majority's conclusions regarding the scope and use of the easement by the dominant estate owners (lot owners). The issue is the same as was before the court in Cartish: Whether riparian rights were implicit in the easement rights reserved to the benefit of the lot owners. 157 So.2d at 153. It is of no bearing whether the fee owner has erected a dwelling on the land or whether that dwelling is occupied.
The easement measures 22 feet wide and 347 feet in length, terminating at the waters of Boca Ciega Bay. I concur with the trial court and the 1958 final decree that the easement language is unambiguous. As the trial court aptly noted: "This court further finds that an easement providing `ingress and egress' over lands reaching navigable waters necessarily conveys the riparian rights associated with those lands. Cartish v. Soper, 157 So.2d 150 (Fla. 2d DCA 1963)." Cartish is the controlling case. It involved an easement in the same subdivision and to the same body of water as in this case. In addition, the language of the easement was virtually *375 identical. The majority also found the easement language to be unambiguous, yet limited the use of the easement to the construction of a dock (if allowable) and to entry into the waters of the bay. This is where I believe the majority in the present case erred. The majority concluded that without a "more elaborate written easement," the rights of the lot owners are vastly restricted. The opposite is true. An easement such as this cannot arise without the participation of the fee owner.[5] Here, that was Mr. Davis. Davis could have inserted limiting language in the easement, but he did not. Feig, 100 So.2d at 195, confirmed this premise in stating: "A dedicator may reserve all riparian rights appurtenant to the land encumbered by the easement dedicated." Limiting language was contained in the easement in Hume v. Royal, 619 So.2d 12 (Fla. 5th DCA 1993). In contrasting Cartish, the Hume court stated: "The easement granted in Cartish simply did not contain the restrictive language which we find in this case." Id. at 14. The lot owners in Cartish were seeking more than simply the right to construct a dock. The Cartish court stated: "In response to appellees' prayer for a declaration of rights in the easement, the able chancellor determined that riparian rights were implicit in the easement rights reserved to the benefit of appellees." 157 So.2d at 153.
Cartish did not limit the riparian rights of the lot owners seeking use of the easement. Riparian rights are few in number. The trial court delineated the riparian rights the lot owners could enjoy. They included the right to fish and enjoy views of and over the waters. These rights, as the trial court noted, also include the right to build a properly permitted dock or observation platform. However, the lack of a dock or related structure will not defeat or frustrate the other rights of the lot owners.
Even if the easement had been found to be ambiguous, the historical testimony at trial would have supported the same result.[6]
Lastly, it has been noted that the terms riparian rights and littoral rights are now used interchangeably. Technically, riparian rights apply to a river or stream. Regarding riparian rights, Black's Law Dictionary states: "Term is generally defined as the right which every person through whose land a natural watercourse runs has to benefit of stream as it passes through his land for all useful purposes to which it may be applied." Black's Law Dictionary 1327 (6th ed.1990). Riparian rights have become the common parlance, yet in our case the rights are actually littoral. Black's Law Dictionary defines littoral rights as "[r]ights concerning properties abutting an ocean, sea or lake rather than a river or stream (riparian). Littoral rights are usually concerned with the use and enjoyment of the shore." Id. at 934.

*376 APPENDIX A

*377 APPENDIX B

I would affirm the trial court in all respects.
NOTES
[1] Robert Frost, "Mending Wall," Seven Centuries of Verse: English and American, 588 (Charles Scribners Sons, 3d ed., 1967).
[2] The dissent suggests that it is of "no bearing" whether the owner of the servient estate has erected a dwelling on the parcel. While Judge Whatley may be entirely correct on this point, we have kept the issue on appeal as narrow as the facts of this case permit.
[3] "In common usage `riparian' is generally used to define property having water frontage. In fact, the term `riparian' refers specifically to land abutting non-tidal or navigable river waters whereas `littoral' refers to the land abutting navigable ocean, sea, or lake waters." Kester v. Tewksbury, 701 So.2d 443, 444 n. 2 (Fla. 4th DCA 1997). Although the use of "riparian" in this case is technically incorrect, it is consistent with the accepted usage in Florida cases. See Bd. of Trustees of the Internal Improvement Trust Fund v. Sand Key Assocs., Ltd., 512 So.2d 934 (Fla.1987).
[4] Judges Wallace and LaRose are recused from this case.
[5] In most instances the easement is created by the owner of the fee. 20 Fla. Jur.2d Easements § 13 (2000).
[6] Such testimony was elicited with regard to the abandonment issue raised by the Brannons.