DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**FLORIDA DEPARTMENT OF TRANSPORTATION,**
Appellant,

v.

**LAUDERDALE BOAT YARD, LLC,**
Appellee.

No. 4D20-1184

[January 5, 2022]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Jeffrey R. Levenson, Judge; L.T. Case No. CACE19-5032.

Rafael Garcia, Interim General Counsel, and Marc Peoples, Assistant General Counsel, Florida Department of Transportation, Tallahassee, for appellant.

Kara Rockenbach Link and David A. Noel of Link & Rockenbach, PA, West Palm Beach, and Charles R. Forman and Vanessa Thomas of Forman, Hanratty & Montgomery, Ocala, for appellee.

KLINGENSMITH, J.

Florida Department of Transportation ("FDOT") appeals the trial court's final declaratory judgment finding that appellee Lauderdale Boat Yard ("LBY") had riparian rights of access to the South Fork of New River. The trial court found that LBY's riparian rights either attached at their boatlift seawall or alternatively attached at the boundary between two submerged parcels and that LBY had an implied easement to cross one submerged parcel and access New River. We reverse the trial court's judgment on both grounds.

LBY sued FDOT for a declaration that its property ("Tract A") had riparian rights of access to New River. Tract A was derived from an original larger property ("Parent Tract") that the federal government conveyed to the State of Florida in 1880. The legal description of the Parent Tract included uplands and submerged lands to the center of the South Fork of New River and riparian rights along the entire riverfront. Before LBY acquired the property, several previous owners substantially dredged and

1

improved it, altering the amount of land above and below the water. These improvements included construction of a boatlift and an artificial covered basin surrounding it ("basin area").

In 1983, when the property was owned by LBY's predecessor, Choate, FDOT brought a condemnation action for a portion of the Parent Tract to construct the I-595 bridge. After the parties settled in 1985, the trial court entered a final judgment ("1985 judgment") requiring FDOT to compensate Choate $1.2 million for the taking of a large piece of submerged land ("Parcel 104") that included all access rights in the corridor where the I-595 bridge would be located, starting at a plane about forty feet above ground level. FDOT's taking did not include any ground level access rights and did not mention a taking of riparian rights.

FDOT also obtained a sovereign submerged land easement for a property adjacent to Parcel 104, known as Parcel 108. The sovereign submerged land easement allowed FDOT to construct the I-595 bridge on and above submerged land owned by the State of Florida Board of Trustees of the Internal Improvement Trust Fund, which holds submerged lands in trust for the Floridian public.[1]

The bridge was completed by 1988. The following year, Choate replatted his remaining upland property to create Tract A and quit-claimed it to his company, Artmarine. FDOT's taking eliminated the covered basin and some of the seawall where large boats previously docked, however Choate continued operating the property as a boatyard for smaller boats. For boats to use the boatlift, they needed to travel over Parcel 108, and at no time did FDOT object to Choate's use of the boatlift or his access to New River.

In 2016, LBY obtained Tract A, which included the uplands, the boatlift piers, and "all appurtenances." LBY retained the existing boatyard tenants and continued to operate Tract A as a boatyard. Title to Tract A did not include the remaining submerged lands between the boatlift seawall and the boundary with Parcel 108 or the boatlift. It is unclear whether Choate intended to retain any ownership interest in these dredged, submerged lands ("Choate Remnant Parcel").

A year later, FDOT notified LBY that it had no riparian rights of access to New River since those rights were condemned in the 1985 judgment.

---

[1] "The custodians of [the public] trust are the Trustees of the Internal Improvement Fund." *Hayes v. Bowman*, 91 So. 2d 795, 800 (Fla. 1957).

According to FDOT, this meant LBY had no legal right to use the boatlift. FDOT informed LBY that it planned to add travel lanes to the I-595 bridge and that the new bridge supports would likely restrict LBY's access from the boatlift to New River.

In 2019, LBY filed the underlying action seeking a declaratory judgment that it retained riparian rights of access to and from New River. Choate was not a party to the legal proceedings. Multiple experts testified at the non-jury trial where the main issue was whether LBY had riparian rights of access from the boatlift to the South Fork of New River.

The trial court issued a final judgment in favor of LBY with alternative rulings. The trial court found that the mean high-water line[2] is located at the boatlift seawall and that all submerged land between the boatlift seawall and New River are subject to LBY's riparian access rights. This meant that LBY had riparian rights of access to New River emanating from LBY's boatlift seawall along Tract A's southern boundary.

The trial court also found the use of the boatlift and travel over Parcel 108 was essential to the boatyard operations and that LBY operated the boatyard as Choate had. So, the trial court made an alternative finding that the mean high-water line was the boundary of Parcel 108 and the Choate Remnant Parcel. Therefore, LBY had riparian rights of access emanating from the boundary between the Choate Remnant Parcel and Parcel 108 with an implied easement of necessity over the Choate Remnant Parcel. This appeal followed.

"On review of a declaratory judgment, we defer to the trial court's factual findings if supported by competent, substantial evidence." *Vill. of N. Palm Beach v. S & H Foster's, Inc.*, 80 So. 3d 433, 436 (Fla. 4th DCA 2012). "To the extent a decision rests on a question of law, however, an order is subject to de novo review." *Crapo v. Provident Grp.-Continuum Props., L.L.C.*, 238 So. 3d 869, 874 (Fla. 1st DCA 2018).

"In Florida, the State owns in trust for the public the land permanently submerged beneath navigable waters and the foreshore (the land between the low-tide line and the mean high-water line)." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 707 (2010) (citing to Art. X, § 11, Fla. Const.). The State has a duty to manage sovereign submerged lands "for the benefit of all the citizens of the State."

---

[2] The trial court's final judgment referred to the mean high-water line as the "sovereign line."

*City of West Palm Beach v. Bd. of Trs. of the Internal Improvement Tr. Fund*, 746 So. 2d 1085, 1089 (Fla. 1999). To be considered sovereign submerged land, it must have been navigable when Florida joined the union. *Picciolo v. Jones*, 534 So. 2d 875, 877 (Fla. 3d DCA 1988) ("Only a waterbody which was navigable in its natural state at the time Florida became a state in 1845 is subject to federal or state sovereignty.").

"Although the issue of navigability requires resolving some factual questions based on the particular circumstances of each case, the ultimate conclusion as to navigability is a question of law inseparable from the particular facts to which they are applied." *Briggs v. Jupiter Hills Lighthouse Marina*, 9 So. 3d 29, 32 (Fla. 4th DCA 2009). Navigability is determined by "whether the body of water is permanent in character, and whether in its ordinary and natural state, it is navigable for useful purposes and so situated that it may be used for purposes common to the public in the locality where it is located." *Brevard County v. Blasky*, 875 So. 2d 6, 13–14 (Fla. 5th DCA 2004). "[C]apacity for navigation, not usage for that purpose, determines the navigable character of waters with reference to the ownership and uses of the land covered by the water." *Lopez v. Smith*, 145 So. 2d 509, 513 (Fla. 2d DCA 1962). However, "[w]aters are not under our law regarded as navigable merely because they are affected by the tides." *Clement v. Watson*, 58 So. 25, 26 (Fla. 1912).

If waters are navigable, the State owns the land below the mean high-water line as sovereign submerged land. *Stop the Beach Renourishment, Inc.*, 560 U.S. at 707. This makes the mean high-water line "[t]he boundary between public lands and private uplands." *Walton County v. Stop Beach Renourishment, Inc.*, 998 So. 2d 1102, 1113 (Fla. 2008), *aff'd*, *Stop the Beach Renourishment*, 560 U.S. 702. "The mean high water line or ordinary high water mark 'is described as the point up to which the presence and action of the water is so continuous as to destroy the value of the land for agricultural purposes by preventing the growth of vegetation.'" *5F, LLC v. Dresing*, 142 So. 3d 936, 938 n.1 (Fla. 2d DCA 2014) (quoting *Bd. of Trs. of the Internal Improvement Tr. Fund v. Walker Ranch Gen. P'ship*, 496 So. 2d 153, 155 (Fla. 5th DCA 1986)). "Those who own land extending to ordinary high-water mark of navigable waters are riparian holders who, by implication of law . . . have in general certain special rights . . . of access from the water to the riparian land . . . ." *Brannon v. Boldt*, 958 So. 2d 367, 373 (Fla. 2d DCA 2007) (quoting *Broward v. Mabry*, 50 So. 826, 830 (Fla. 1909)).

"Private riparian rights to navigable waters are given to those whose land extends to the high-water mark." *Id.* "Riparian rights are rights to use the water." *BB Inlet Prop., LLC v. 920 N. Stanley Partners, LLC*, 293

So. 3d 538, 542 (Fla. 4th DCA 2020) (quoting *Brannon*, 958 So. 2d at 372). "In Florida, riparian rights include '(1) general use of the water adjacent to the property, (2) to wharf out to navigability, (3) to have access to navigable waters and (4) the right to accretions.'" *Tewksbury v. City of Deerfield Beach*, 763 So. 2d 1071, 1071 (Fla. 4th DCA 1999) (quoting *Belvedere Dev. Corp. v. Dep't of Transp.*, 476 So. 2d 649, 651 (Fla. 1985)). "[R]iparian rights are incident to the ownership of lands contiguous to and bordering on navigable waters." *Dresing*, 142 So. 3d at 940 (quoting *Ferry Pass Inspectors' & Shippers' Ass'n v. White's River Inspectors' & Shippers' Ass'n*, 48 So. 643, 644 (Fla. 1909)).

"Bodies of water which become navigable by artificial means are not converted from private ownership into sovereignty lands." *Odom v. Deltona Corp.*, 341 So. 2d 977, 981 (Fla. 1976) (citing *Clement*, 58 So. at 27). Further, "riparian rights do not ordinarily attach to artificial water bodies or streams . . . ." *Publix Super Markets, Inc. v. Pearson*, 315 So. 2d 98, 99 (Fla. 2d DCA 1975).

In *Clement*, the Florida Supreme Court considered whether dredging a tidal cove made it navigable and, therefore, subject to riparian rights. 58 So. at 27. The mouth of the cove abutted a river, was affected by tides, and was shallow with a sandbar that was visible during low tide. *Id.* at 26. Prior owners of the subject property dredged a channel in the sandbar to extend the wharf on the property. *Id.* The Court found that the cove was not navigable and was therefore subject to private ownership, including its fishing rights. *Id.* The Court further reasoned that the channel did not change the navigability of the cove because "[t]he fact that a part of the cove was made navigable by artificial means after it became private property did not take away the right of the owner to control the fishing privileges therein subject to law." *Id.* at 27. Therefore, even though dredging made the cove artificially navigable, the cove remained private property, not sovereign submerged land. *Id.*

Here, the trial court found that the boatlift seawall was the mean high-water line, giving LBY riparian rights of access to New River. However, under Florida law, this seawall north of the dredged Choate Remnant Parcel cannot be the mean high-water line. *See id.* When the basin area and boatlift were dredged, this land became privately owned submerged land. Tract A is separated from New River by the submerged property known as the Choate Remnant Parcel. The trial court's placement of the mean high-water line at the boatlift seawall allows for LBY's riparian rights of access to prevail over Choate's rights as a possible submerged landowner bordering New River, treating the Choate Remnant Parcel as sovereign submerged land sold to a private party. *See Dresing*, 142 So. 3d

at 940. This implies that the basin area is or once was sovereign submerged land. *See Walton County*, 998 So. 2d at 1109 ("the State holds the lands seaward of the [mean high-water line] . . . ."). The State never held this submerged land in trust, and it cannot be treated as such simply because it was artificially submerged. *See Clement*, 58 So. at 26 ("Lands not covered by navigable waters and not included in the shore space between ordinary high and low water marks immediately bordering on navigable waters are the subjects of private ownership . . . ."). Therefore, the boatlift seawall cannot be the mean high-water line indicating the boundary between the private uplands and public submerged lands. *See Broward*, 50 So. at 830.

We now turn to the trial court's alternative ruling that LBY had riparian rights of access emanating from the boundary between the Choate Remnant Parcel and Parcel 108 with an implied easement of necessity over the Choate Remnant Parcel. It is undisputed that the Parent Tract had riparian rights to the entire river frontage before it was developed at New River's natural shoreline. *See BB Inlet Prop.*, 293 So. 3d at 543. However, for LBY's Tract A to have riparian rights along that southern boundary, simply abutting navigable waters is insufficient; property ownership must extend to the mean high-water line. *See Colgan as Tr. of Tr. of Sean Colgan Dated January 25, 2008 v. Shadow Point, LLC*, 276 So. 3d 855, 857-58 (Fla. 3d DCA 2018) (the record must show "that [the property owner] had an ownership interest in uplands that 'extend to the ordinary high watermark of the navigable water' in order to justify the trial court's determination that [it] possessed riparian rights in the area of the disputed property.").

Nothing in the record shows that Tract A was replatted to extend to the boundary of Parcel 108. While LBY's deed states that LBY owns the property with "all appurtenances," it is unclear that Tract A retained riparian rights after replatting. *See* § 253.141, Fla. Stat. (2019) (riparian rights "are appurtenant to and are inseparable from the riparian land"). If, as the trial court found, the boundary between Parcel 108 and the Choate Remnant Parcel was the mean high-water line, Tract A could not have riparian rights attach unless LBY had an ownership interest in the Choate Remnant Parcel that extends to the mean high-water line. *See Brannon*, 958 So. 2d at 373. Because Choate was not a party to the proceedings below, there was no evidence about what property interests he intended to convey when he sold Tract A, including whether he intended to retain any ownership interest in the Choate Remnant Parcel.

The trial court erred in declaring an implied easement over submerged land that Choate may still have an ownership interest in. The trial court's

6

alternative ruling suffers from two fatal flaws. First, the remedy of an implied easement by way of necessity was never requested by any party; the trial court ordered an equitable remedy that was not requested in the pleadings or litigated at trial. "It is well settled that an order adjudicating issues not presented by the pleadings, noticed to the parties, or litigated below denies fundamental due process." *Albert v. Rogers*, 57 So. 3d 233, 236–37 (Fla. 4th DCA 2011) (quoting *Neumann v. Neumann*, 857 So. 2d 372, 373 (Fla. 1st DCA 2003)). "A trial court is without jurisdiction to award relief that was not requested in the pleadings or tried by consent." *Wachovia Mortg. Corp. v. Posti*, 166 So. 3d 944, 945 (Fla. 4th DCA 2015).

Second, and perhaps more importantly, the trial court imposed the implied easement over property ostensibly owned by Choate even though he was never a party to the case and was not given a chance to be heard prior to the court issuing its judgment. *See Stevens v. Tarpon Bay Moorings Homeowners Ass'n*, 15 So. 3d 753, 755 (Fla. 4th DCA 2009) (holding that non-parties must be joined when the trial court's judgment "cannot be carried out without affecting the interests of these [non-parties]"). "[T]he general rule in equity is that all persons materially interested, either legally or beneficially, in the subject-matter of a suit, must be made parties either as complainants or defendants so that a *complete decree* may be made binding upon all parties." *Two Islands Dev. Corp. v. Clarke*, 157 So. 3d 1081, 1084 (Fla. 3d DCA 2015) (quoting *Sheoah Highlands, Inc. v. Daugherty*, 837 So. 2d 579, 583 (Fla. 5th DCA 2003)).

It follows that, "[t]he owner of a servient tract is a necessary party to a case in which the rights of another land owner to utilize the servient tract are adjudicated." *State, Dep't of Transp. v. S.W. Anderson, Inc.*, 744 So. 2d 1098, 1099 (Fla. 1st DCA 1999). Due process requires that the court have jurisdiction over an owner of a property interest before the court can adjudicate any of his ownership rights. *See Two Islands Dev. Corp.*, 157 So. 3d at 1083–84; *see also Cline v. Cline*, 134 So. 546, 548–49 (Fla. 1931) ("For these reasons, no doubt, this court has repeatedly held that persons whose interests will necessarily be affected by any decree that can be rendered in a cause are necessary and indispensable parties and that the court will not proceed without them.").

Therefore, we reverse the court's final declaratory judgment and remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

WARNER and LEVINE, JJ., concur.

7

*          *          *

*Not final until disposition of timely filed motion for rehearing.*