NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

JOSEPH LEHMANN and )
THERESE LEHMANN, )
) 
Appellants, )
)
v. )      Case No. 2D15-4968
)
COCOANUT BAYOU ASSOCIATION, )
INC., )
)
Appellee. )
_____ )

Opinion filed April 5, 2019.

Appeal from the Circuit Court for
Sarasota County; Kimberly Carlton
Bonner, Judge.

David A. Wallace of Bentley & Bruning,
P.A., Sarasota, and M. Lewis Hall, III, of
Williams Parker Harrison Dietz &
Getzen, Sarasota, for Appellants.

Stephen Henry Kurvin of Sarasota,
for Appellee.


SALARIO, Judge.

         This is one mess of a dispute over title to real property. It involves a

parcel of land on Siesta Key in Sarasota County, various portions of which were

conveyed in more than one deed to more than one person over the span of decades.

Many of the property descriptions in those deeds include boundaries defined by streets that no longer exist and that have changed names. Much of the land that once defined the boundaries of the property has been swallowed up by the Gulf of Mexico. There is no simple, reliable drawing in our record that clearly explains to the layman what the parcel looks like in relation to its surroundings. The applicable law has changed over time. Getting to the bottom of the case has been a bit like untangling spaghetti.

The bottom line is this. At our direction after a previous appeal, see Lehmann v. Cocoanut Bayou Ass'n, 157 So. 3d 289 (Fla. 2d DCA 2014), the trial court conducted proceedings to determine ownership of the disputed parcel of land.[1] It divided the parcel into three parts and settled title with Joseph and Therese Lehmann for two of those parts and Cocoanut Bayou Association for one. The Association has not challenged that part of the trial court's final judgment that found in favor of the Lehmanns—perhaps because the parts of the disputed parcel they were found to own now lie largely underneath the Gulf—and we affirm the judgment to that extent. We conclude, however, that the Lehmanns also own the third part of the parcel because they or their predecessors in title owned the property extending to the centerlines of the roads that used to be there, either because they always had title to that property by virtue of having had title to the lots abutting those roads or because they had a reversionary interest in the land underneath the roads that vested when the roads were vacated by Sarasota County. We reverse the trial court's order to the extent it awarded

---

[1]The original opinion did not involve a final settlement of the question of ownership of the part of the disputed parcel at issue in this appeal, but rather the application of the Marketable Record Title Act, ch. 712, Fla. Stat. (2012), to the root of title for the deeds expressly conveying title to the lands in and adjacent to it.

part of the parcel to the Association and remand with directions to quiet title to all of the disputed parcel in favor of the Lehmanns.

### *The Disputed Parcel*

The disputed parcel lies in what was originally known as the Siesta subdivision and is now called the Cocoanut Bayou subdivision.  Today, it is a narrow strip of land that is at its widest point twelve and one-half feet wide and eighty-six feet long.  Based on a 1912 revised plat for the Siesta subdivision, the parcel would have been bordered on the east by the western edge of a short, east-west road called Bee Street that ended at the eastern edge of a north-south road called Gulf Avenue.  The parcel's twelve-and-one-half-foot width would have been bounded to the north by the extended center point of Bee Street and to the south by an extension of Bee Street's southern boundary and the northern boundary of Lot 10 of Block 60 of the subdivision.  It would have extended westward from Bee Street at Block 60 to the shores of Bayou Louise.  On the western side of Bayou Louise were additional platted lots and, on the other side of those, the Gulf of Mexico.  As shown in the 1912 revised plat, the disputed parcel and its surrounding land looked like this (with the approximate disputed parcel circled in the area to the west of Bee Street):[2]

---

[2]Neither this nor any other drawing used in this opinion is intended to suggest technical accuracy of measurement or description.  The drawings are intended simply to provide the reader with a rough visual depiction of what is described in the text.



The subdivision was partially replatted in 1944. For reasons that are not clear from our record, the area called Gulf Avenue a/k/a Shell Road in the 1912 revised plat is named only Shell Road in the replat.[3] By the time of the replat, the Gulf had overtaken the lots that once existed on the western side of Bayou Louise, and much of the bayou had become dry land susceptible to being conveyed. On the western side of Shell Road there was a small area of dry land and then the Gulf. Circumstances remain much the same today except that Sarasota County vacated Bee Street in 1949 and Gulf Avenue in 1983. Whatever right or title the County had in those lands is gone, and Bee

---

[3]There is a factual issue as to whether Gulf Avenue and Shell Road are the same roads covering the same area. Except where further description is necessary, we refer to the land designated on the 1912 plat (as Gulf Avenue) and on the 1944 replat (as Shell Road) as Gulf Avenue for simplicity's sake. Both plats show the roadway as in approximately the same place north to south when accounting for changes in the shoreline east to west. Both plats show the road as parallel to the waterline of what was, in 1912, Bayou Louise, which changed over time to become dry land and eventually part of the Gulf of Mexico. This change may partially explain the discrepancies regarding the exact location of the road on these plats.

Street and Gulf Avenue no longer exist as roads.  Also, virtually all of the dry land west of what was Gulf Avenue has been swallowed up by the Gulf.

With this understanding of the nature of the disputed parcel behind us, we now turn to the competing claims of ownership to that parcel.

### *The Competing Chains of Title*

Understanding the competing claims of ownership to the disputed parcel requires understanding the recorded deeds purporting to convey title to that land.  The beginning of the story for our purposes is that all of the property in the Siesta subdivision was originally owned by E.S. and Helen Boyd, with one exception.  The exception is Lots 10 and 11 of Block 60—recall that Lot 10 abuts what was Bee Street on its south side and what was Gulf Avenue on its east side—which were originally owned by Kathleen Ingalls.

In 1945, Ms. Ingalls conveyed title to Lots 10 and 11 to James and Alice Thomas.  In 1946, the Boyds conveyed title to Lots 9, 12, 13, 14, and the north half of Lot 15 to the Thomases.  The deed also conveyed title to land located to the west of Gulf Avenue described by metes and bounds.  That metes and bounds description had its point of beginning at the centerline of Bee Street extended beyond the end of Bee Street to the west side of Gulf Avenue.  The line was then extended west to the waters of the Gulf, south along the water's edge for a distance, then east to the western edge of Gulf Avenue, then north back to the point of beginning.  That conveyance covered all of the property to the west of the part of the disputed parcel at issue in this appeal and looked—very roughly—something like this:



See also Lehmann, 157 So. 3d at 290 (describing the property conveyed in the 1945 Ingalls-to-Thomas deed and the 1946 Boyd-to-Thomas deed).

In October 1949, Sarasota County executed a deed vacating Bee Street, thereby relinquishing any title or interest it had in the property. The parties have stipulated that the Association thereby obtained title to the north half of Bee Street, and the Thomases, as the owners of Lots 9 and 10, obtained title to the south half. As a result, the Thomases' property bordered Gulf Avenue on both the east and west sides from the centerline of Bee Street to the south as of 1949. In December 1949, the Thomases conveyed Lots 9, 12, 13, 14, the north half of Lot 15, and the property described by metes and bounds in the 1945 Ingalls-to-Thomas deed to Ms. Thomas individually. In a corrective deed in 1950, Mr. Thomas conveyed the property described

- 6 -

in the October 1949 deed together with Lots 10 and 11, which had not been conveyed in the 1949 deed.

Now things are about to get more complex. In 1952, the Boyds deeded some property to the Association.[4] That deed conveyed title to the south 100 feet of Block 59, which shared a boundary with what was once the northern boundary of Bee Street. And it also purported to convey title to land adjacent to the northern border of the property deeded to the Thomases by way of the Ingalls-to-Thomas deed. That land was described by metes and bounds. The point of beginning was the western edge of Higel Avenue—a street immediately east of Blocks 59 and 60—one hundred feet to the north of the centerline of Bee Street. From there, it went west to the Gulf, south to the southern side of an extended Bee Street, east back to the point where Bee Street had once ended at Gulf Avenue, north to the centerline of Bee Street, east to Higel Avenue, and then north to the point of beginning. That conveyance included much of the land titled in the Association to the north of the disputed parcel today, as well as the disputed parcel. It excluded all of what was once Bee Street's southern half that the Association has stipulated vested with the Thomases through the Ingalls chain of title in 1949. It looked something like this:

_____

[4]To be precise, the Boyds actually deeded the property to a predecessor entity to the Association. Because the predecessor entity is irrelevant here, and for the sake of simplicity, we refer only to the Association and its predecessors as the Association throughout this opinion.



See also <u>Lehmann</u>, 157 So. 3d at 290-91 (describing the property conveyed in the 1952 Boyd-to-Association deed).

To the extent it is not obvious, there is a problem here. The Boyd-to-Association deed also includes a chunk of land—everything that deed tried to convey west of Gulf Avenue—that the Boyds had expressly deeded to the Thomases back in 1946. In 1952, the Boyds no longer had title to that land. And to the extent the deed they gave the Association tried to convey it, it was a wild deed. <u>See</u> <u>Lehmann</u>, 157 So. 3d at 293 (holding that the 1952 Boyd-to-Association deed was wild as to that portion of land). The Boyd-to-Association deed also purported to convey title to the area from the intersection of Bee Street and Gulf Avenue on the eastern edge of Gulf Avenue to the boundaries of the expressly-deeded Thomas land to the west of Gulf Avenue—land which comprises part of the disputed parcel. The land both to the west and to the east of Gulf Avenue south of the extended centerline of Bee Street was not owned by the

- 8 -

Boyds when the 1952 conveyance purported to pass title to the land under Gulf Avenue south of the centerline of Bee Street to the Association.

There is still more. In 1964, Ms. Thomas deeded Lots 10, 11, 12, the north twelve and one-half feet of Lot 13, and the northerly eighty-seven and one-half feet of Lot 9 to her daughter, Alice Thomas Shannon. That deed also included property described in metes and bounds as the land between the westerly boundary of the conveyed lots bounded on the north by the westerly extension of the north line of Lot 10 to the Gulf and on the south by the westerly extension of the north line of the north one-half of Lot 13. That description includes land on what used to be Gulf Avenue that was not expressly conveyed by the 1946 Boyd-to-Thomas deed—Ms. Shannon's root of title—but that nonetheless was properly conveyed for the reasons we describe below.

The property Ms. Thomas deeded to Ms. Shannon passed to multiple buyers in multiple transactions until coming to rest with the Lehmanns in 1979. When they purchased the property, Mr. Lehmann became aware that the chain of title represented conflicting claims to ownership of the disputed parcel. In what appears to be an attempt to protect their interest in that parcel, Mr. Lehmann deeded that parcel to his then-wife Judy in 1982. There were subsequent transactions related to this property, but none are relevant to this appeal.

Two additional points relevant to these conveyances deserve mention now because they will become important later. First, neither the 1912 nor the 1944 plat maps contain any express reservations of rights other than riparian rights, which are not at issue here. Second, our record does not reflect that any of the relevant deeds contain language reserving title to areas designated as streets or reserving reversionary interests in such areas to the dedicators, and neither party has argued that they do.

- 9 -

### *The Final Judgment and the Appellate Issues*

The history of this litigation is long, but it is not too important. What the reader needs to know is that the case was previously before this court on an appeal from a final judgment rendered after a nonjury trial settling title to the whole of the disputed parcel in the Association based on a claim it had asserted under the Marketable Record Title Act. See Lehmann, 157 So. 3d at 291-92. We reversed that aspect of the final judgment, affirmed insofar as it rejected the Lehmann's counterclaim for adverse possession, and remanded for a decision about who owns the disputed parcel (once the appeal had settled the wild deed and Marketable Record Title Act issues). Id. at 294.

On remand, based in substantial part on the record developed in the nonjury trial, the trial court divided the disputed parcel into parts designated 1, 2, and 3 and held that the Lehmanns and the Association each owned parts of the disputed parcel. The trial court's division of the property looked something like this:[5]

---

[5]This map was used by the trial court in its final judgment to explain its division of the disputed parcel. There is a question as to whether the map accurately reflects the relevant boundaries. We do not need to resolve that question because this opinion concludes that all of the chains of title lead to the Lehmanns as the owners of all of the disputed parcel. We use this map to show what the trial court did and to give the reader a rough sense of what the disputed parcel and its three parts look like.



The trial court held that the Association owned part 1, which is bounded on the north by the extended centerline of Bee Street and on the south by the extended south line of Bee Street—essentially, that portion of the property that used to be part of Gulf Avenue—based on the 1952 Boyd-to-Association deed. It then held that parts 2 and 3—most of which now lie under the Gulf, but some of which may have also fallen under Gulf Avenue from the west—were owned by the Lehmanns based on the 1945 Boyd-to-Thomas deed. The trial court quieted title accordingly.

The Lehmanns appeal that portion of the judgment quieting title in part 1 in favor of the Association. We review the trial court's findings of fact for competent substantial evidence and its legal conclusions de novo. See Corya v. Sanders, 155 So. 3d 1279, 1283 (Fla. 4th DCA 2015) ("After a nonjury trial, review of trial court decisions

- 11 -

based on legal questions are reviewed de novo and those based on findings of fact from disputed evidence are reviewed for competent, substantial evidence.").  The Lehmanns raise three issues.  First, they argue that the 1945 Ingalls-to-Thomas deed and the 1946 Boyd-to-Thomas deed included reversionary interests in the land underneath Bee Street and Gulf Avenue, such that when Sarasota County vacated those roads, title to the land passed to the Thomases and, thereafter, to the Lehmanns.  Second, they assert that as owners of the lots abutting Bee Street and Gulf Avenue, the Boyds and Ms. Ingalls had title to that land and conveyed it to the Thomases, such that title ultimately passed to the Lehmanns.  Third, they argue that the evidence was insufficient to support the trial court's findings as to the boundaries of Gulf Avenue and, relatedly, that the trial court relied for this purpose on an inaccurate exhibit never admitted into evidence.[6]  As we discuss below, we resolve the case based on the first two arguments, rendering it unnecessary for us to address the third.

### *Framing the Issues: How We Determine Who Owns Part 1*

The central question in this case is whether the Lehmanns or the Association hold title to what used to be Gulf Avenue at the point where the southern half of Bee Street ended.  In our prior opinion, we recognized that that property was not expressly included in the 1946 Boyd-to-Thomas deed but was expressly included in the

---

[6]The Lehmanns also raise an issue related to the trial court's order dissolving a stay and directing disbursement of funds held in the registry of the court that only indirectly relates to the title determinations that are the subject of this opinion.  Because of our reversal on the substantive issue, that portion of the final judgment must also be reversed.  To the extent the final judgment also made other findings, such as those related to adverse possession, those portions of the judgment were not challenged, and we affirm them without further comment.

- 12 -

1952 Boyd-to-Association deed. See Lehmann, 157 So. 3d at 290-91. The trial court on remand found that fact dispositive of the question of who owned the land in part 1 and quieted title in favor of the Association based on the express conveyance of it in the 1952 deed. Although its order did not explicitly address whether title to part 1 passed to the Lehmanns' predecessors in title before the 1952 Boyd-to-Association deed by means other than an express conveyance, its decision necessarily rejects that argument. That rejection is important to our consideration of this appeal. See Gulfwind S., Inc. v. Jones, 775 So. 2d 311, 313 (Fla. 2d DCA 2000) ("[T]he trial court impliedly made certain findings of fact that require the reversal . . . .").

If someone other than the Boyds held title to part 1 before the 1952 Boyd-to-Thomas deed, however, that deed could not have conveyed title to part 1 to the Association. See Lehmann, 157 So. 2d at 293 (describing a deed attempting to convey title to a parcel that the purported conveyor of title does not own at the time of conveyance as wild). We know that title to part 1 was not expressly conveyed in a deed before 1952. Thus, we must consider whether, before the 1952 deed, someone other than the Boyds had title to part 1 by means other than an express conveyance and whether title vested with the Lehmanns as a result.

The question of whether someone else obtained title to part 1 by means other than an express conveyance requires us to consider how title passes to the lands underneath areas designated on plat maps as streets. A plat map is "[a] document showing the legal divisions of land by lot, street, and block number" that may be referred to for purposes of describing the property depicted on the map in conveyances and the like. *Plat map*, Black's Law Dictionary (10th ed. 2014). In general, the designation of land on a plat map as a street may evidence either a common law dedication or a

- 13 -

statutory dedication of that land for use as a street.  See generally Pelican Creek Homeowners, LLC v. Pulverenti, 243 So. 3d 467, 470-71 (Fla. 5th DCA 2018) (describing ways in which land may be dedicated on a plat map as a street).

The difference between common law and statutory dedications is significant for purposes of determining who owns the underlying land.  In the absence of a clear intention to the contrary, a common law dedication "does not divest the owner of the title to the land, but only subjects the land and the title to the public easement for street purposes," with title remaining in the dedicator or his or her successors in title. Robbins v. White, 42 So. 841, 841-44 (Fla. 1907); see also Burkhart v. City of Fort Lauderdale, 156 So. 2d 752, 757 (Fla. 2d DCA 1963), quashed on other grounds, 168 So. 2d 65 (Fla. 1964).  Under the language of the applicable statutes governing statutory dedications, a statutory dedication vests title in a state, county, or municipal government—depending on the circumstances—and divests the dedicator of his or her title in the underlying land.  See § 95.361, Fla. Stat. (2018) (expressing the current mechanism for accomplishing a statutory dedication); § 341.51, Fla. Stat. (1935) (expressing the mechanism for accomplishing a statutory dedication in effect from 1935 to 1955); Pelican Creek, 243 So. 3d at 471 (describing the effect of a statutory dedication).  Thus, while the owner of land in a common law dedication of a street retains title to the land and is free to convey it, the owner in a statutory dedication does not and cannot.  As we explain later, however, the owner in a statutory dedication may retain a reversionary interest in the land such that when the government's relinquishment of that dedication becomes effective, that future interest to the land vests in the owner or his successor in title.

Here, we have two plat maps—one recorded in 1912 and one recorded in 1944—each of which designates Bee Street and Gulf Avenue as streets. Turning first to the 1912 plat map, the dedication of Bee Street and Gulf Avenue was of necessity a common law dedication because, in 1912, there was no statute under which a statutory dedication could have been accomplished. Common law was the only option. The record contains no evidence that by putting Gulf Avenue and Bee Street on the 1912 plat map, the property owners intended anything other than a public easement. As such, by operation of law, the owners of the land designated as Gulf Avenue and Bee Streets on the 1912 plat reserved for themselves title to that property subject only to public easements created by placing those streets on the plat map. See Smith v. Horn, 70 So. 435, 436 (Fla. 1915) (explaining that when a plat map shows spaces for streets, "the owner thereby evinces an intention to dedicate an easement in the streets . . . to the public use as such, the title to the land under the street remaining in the owner or his grantees"); Robbins, 42 So. at 843-44 (same). As such, the owners of the land depicted on the plat map as streets were able to convey that land notwithstanding the public's dedicated right to use it as a street. See Pelican Creek, 243 So. 3d at 471.

Pay attention here, because this leads to a legal wrinkle that is central to this case. From the time of the 1912 plat through to today, it has been the law that when property owners retain title to an area subject to a public use easement as a street, title to the land up to the centerline of the street is conveyed by any conveyance of the land abutting the street unless title is expressly reserved by the grantor. See, e.g., Smith, 70 So. at 436 ("[T]he title of the grantees of subdivisions abutting on such streets, in the absence of a contrary showing, extends to the center of such highway, subject to the public easement."); Pelican Creek, 243 So. 3d at 471 ("When the owner

- 15 -

of a tract of land makes a subdivision and includes on the plat a dedication of roads . . .,

the conveyance of the lots abutting the roads . . . includes title to the property subject to

the easement, unless expressly reserved by the dedicator.").[7]  As such, the state of play

between the 1912 plat and the 1944 partial replat was (1) there was a north-south

common law easement between the end of Bee Street and the shore of Bayou Louise;

(2) those holding title to the land abutting the property encumbered by the easement (as

relevant here, Ms. Ingalls and the Boyds) took title to the land encumbered by the

easement; and (3) those persons could convey title to the property encumbered by the

easement by conveying title to the abutting land without reserving to themselves title to

the property encumbered by the easement.

       The question then becomes whether the partial 1944 replat or anything

thereafter changed the state of play.  The answer is that it is at least theoretically

possible.  Unlike the situation at the time of the 1912 plat, there was a statutory method

to dedicate a street in 1944—section 341.59, Florida Statutes (1944).  It provided that a

statutory dedication occurs when a street constructed by a county or the state has been

"maintained, kept in repair or worked for a period of four years continuously and

uninterruptedly by" the county or the state and that a statutory dedication may be

proven by the filing with the appropriate circuit court clerk of a map certified by an

appropriate state or county official reciting that the land had vested in the state or

county, as appropriate.  Id.  This was the law when Sarasota County vacated Bee Street

in 1949.  And the law was substantially similar—although amended to account for

---

[7]The same principle is true when such a street is bounded on one side by navigable waters except that titleholder of the abutting, nonsubmerged land on the other side of the dedicated street holds title to the entire street.  See Bonifay v. Dickson, 459 So. 2d 1089, 1095-96 (Fla. 1st DCA 1984).

dedication to municipalities—when Gulf Avenue was vacated by Sarasota County in 1983. See § 95.361, Fla. Stat. (1983). The trial court did not make a finding as to whether a statutory dedication of Bee Street or Gulf Avenue ever occurred, and we are not able to answer that question definitively from the record we have.

Part of the Lehmanns' argument on appeal implies that there may have been statutory dedications of Bee Street and Gulf Avenue to Sarasota County. They assert that the legal consequence of a statutory dedication would be that the landowners abutting those streets held reversionary interests in the land underneath the streets extending to their centerlines that would vest—granting them title to the land—if the land was vacated by Sarasota County.[8] See § 177.085, Fla. Stat. (1983) (governing reversionary interests in platted streets when Gulf Avenue was vacated); § 341.66, Fla. Stat. (1972) (original version of this statute). The parties also agree that something like this principle existed when Sarasota County vacated Bee Street in 1949 because they stipulated in the trial court that the Association got title to the north half of Bee Street and the Thomases got title to the south half by way of the vesting of reversionary interests at the time the street was vacated by the County. The disputed question about possible reversionary interests thus relates only to Gulf Avenue.

The Association argues that the reversionary-interest principle does not apply to Gulf Avenue because Gulf Avenue was not a formally platted road in 1912 or in

_____

[8]The term reversion or reversionary interest is used in multiple ways by the parties here. As relevant to our analysis, a reversion or reversionary interest is simply "[a] future interest left in the transferor or successor in interest," and any property interest becomes vested when "the right to its enjoyment, either present or future, is not subject to the happening of a condition precedent." *Interest*, Black's Law Dictionary (10th ed. 2014).

1944.  Because Gulf Avenue was plainly dedicated on both plats, we take the Association's argument to mean that Gulf Avenue was not a statutorily dedicated road. The Lehmanns disagree both with the position that the reversionary-interest principle does not apply and also with effect on the chain of title to part 1 if, as the Association contends, it does not.  Neither party has done much to help us answer the question of whether Gulf Avenue was ever statutorily dedicated such that the reversionary interest principle does apply.  Ultimately, however, we do not need to answer that question. Gulf Avenue incontestably appeared on both the 1912 and 1944 plats.  If there was not a statutory dedication of Gulf Avenue, then there necessarily was a common law dedication resulting in an easement granting the public use of that land as a street, as described above.  See also Fla. E. Coast Ry. Co. v. Worley, 38 So. 618, 621 (Fla. 1905) (holding that the placement of streets on a plat map "evinces an intention to dedicate the streets to public use as such" and that "[t]his is true although there is no formal written dedication accompanying the map").  As a result, either the abutting-lands principle applies because there was a common law dedication or the reversionary-interest principle applies because there was a statutory one.

As such, to determine whether title to that land passed by a means other than an express conveyance in the 1952 deed, we need consider only two possibilities. The first is that prior to 1952, a deed or deeds conveyed title to Gulf Avenue subject to an easement allowing that land to be used as a street by conveying title to the abutting land and not expressly reserving title to the street to the grantor, such that the land encumbered by the easement could be transferred subject to that easement at any time.  The second possibility is that prior to 1952, a deed or deeds conveyed a reversionary interest in the land underneath Gulf Avenue by virtue of conveying the land

- 18 -

adjacent to Gulf Avenue, which reversionary interest vested and became actual title when Sarasota County vacated Gulf Avenue in 1983, thereby surrendering the title it had held previously.[9]  For the reasons that follow, either possibility leads to the conclusion that part 1 of the disputed parcel belongs to the Lehmanns.

The nub of the reason why is that in the absence of a reservation of title or the reservation of a reversionary interest somewhere in the chain of title, both the abutting-lands principle and the reversionary-interest principle answer the question of who owns the land underneath a road by looking at who owns the land abutting that road and recognizing that the abutting landowner has either title to or a reversionary interest in the land underlying the road to its centerline.  So to determine the outcome under either principle, we have to look at the chains of title to the lands to the west and east of Gulf Avenue—i.e., title on either side of the centerline of Gulf Avenue to its corresponding eastern and western boundaries is determined by looking at the titleholders on each side of it.  For purposes of this analysis, then, one can consider part 1 of the disputed parcel as two subparts divided to the east and west by the centerline

---

[9]We are not tasked with deciding whether the County constructed or maintained the roadway so as to claim a dedicated interest by way of the related statutes, see Chackal v. Staples, 991 So. 2d 949 (Fla. 4th DCA 2008), but we do note that disputes over the County's claims to Gulf Avenue have occurred over the years and were resolved when the County vacated its claims to that roadway in 1983. Accordingly, even if original, vested adjacent-land title did not pass at the times those adjacent lands were conveyed, section 177.085, and its predecessor—section 341.66— would still mandate that the title to the land under Gulf Avenue be conveyed to the abutting property owners by way of the reversionary interest that vested following that vacation unless a competing claim of title was made under that statute, which did not occur here.

of what was Gulf Avenue, looking something like this:



For the land to the west of Gulf Avenue, the relevant documents in the competing chains of title are the 1946 Boyd-to-Thomas deed and the 1952 Boyd-to-Association deed. For the land to the east, we need to look at the 1945 Ingalls-to-Thomas deed, the stipulated consequences of Sarasota County's vacating Bee Street in 1949, and the 1952 Boyd-to-Association deed. Each of the relevant deeds described the property they conveyed by reference to Bee Street and Gulf Avenue. The 1945 Ingalls-to-Thomas deed conveyed Lot 10 of Block 60 as described on the 1912 plat, which placed Lot 10 at the point where Bee Street and Gulf Avenue met. The 1946 Boyd-to-Thomas deed and the 1952 Boyd-to-Association deed both described the land conveyed using boundaries marked by Bee Street and Gulf Avenue on the 1912 plat.

The 1912 plat map, although it expressly reserves any riparian rights within the plat to the original owners, contains no similar reservation of any interest in

the property underlying the roads shown on the plat.[10]  The same is true of the 1944 replat.  And likewise, we do not see (and no party has contended otherwise) that any of the relevant deeds have either expressly excluded the land subject to the public easement as passing with the title to the various surrounding lands or have expressly reserved any reversionary or other interests in the adjacent lands.

With that background established, it becomes clear that either the Lehmanns or their predecessors in title owned the lands abutting both sides of Gulf Avenue, and thus they hold chain of title to the land under it in full.

### *The Abutting-Land Possibility*

Western segment of part 1:  Assuming a common law dedication of Gulf Avenue resulting in an easement, the abutting-land principle applies to the western area of part 1 in a straightforward way.  Both the 1946 Boyd-to-Thomas deed (through which the Lehmanns claim title) and the 1952 Boyd-to-Association deed (through which the Association claims title) expressly reference Gulf Avenue on the 1912 plat map in the boundary descriptions.  Nothing in the record suggests that the 1944 replat of Gulf Avenue as Shell Road (if, as the Association argues, it was not a statutory dedication) did or could have changed the fact that, through the 1946 deed, the Thomases were given title to the land abutting the described property to the centerline of Gulf Avenue from the west.  Nor does anything in the record suggest that when the Boyds passed title to their various successors after the 1912 common law dedication, including the Thomases, they expressly reserved any interest they held in those portions of what was

---

[10]The parties have not argued that reserved riparian rights associated with either the original Bayou Louise or the current Gulf of Mexico affect the determination of title to the Gulf Avenue parcel.

Gulf Avenue or Shell Road. In the case of the western portion of part 1, this means that absent an express reservation of title by the Boyds, which did not occur, title passed from the Boyds to the Thomases in 1946. See Smith, 70 So. at 436; Pelican Creek, 243 So. 3d at 471. As a result, the Boyds had no interest in the land under the western side of Gulf Avenue to convey to the Association in 1952. Thus, even though the 1952 deed expressly purported to convey the land under Gulf Avenue, the Association cannot claim title to that land from the west based on that deed. See Pelican Creek, 243 So. 3d at 472. The land belongs to the Lehmanns as the Thomases' successors in title.

Eastern segment of part 1: Assuming a common law dedication of Gulf Avenue, the abutting-land principle is likewise applicable to how title to the eastern portion of the land under it passed, complicated only by the fact that that we must take the parties' stipulation that there were reversionary interests associated with Bee Street that vested when Sarasota County vacated Bee Street in 1949 into account in determining how title might have passed from the centerline of Gulf Avenue east to what was once the southern half of Bee Street. Bee Street appears on both the 1912 and 1944 plats, and all of the relevant deeds describe the properties abutting Bee Street using the actual boundaries of Bee Street or an imaginary westerly extension of it. When Bee Street was vacated in 1949, the Thomases owned Lot 10 of Block 60 abutting the southern boundary of Bee Street by way of the 1945 Ingalls-to-Thomas deed. Their reversionary interest in the property from the centerline of Bee Street to its southern boundary along Lot 10 vested into full ownership at that time. Under the abutting-lands principle, then, the area from the centerline of Bee street south to northern boundary of Lot 10 became titled in the Thomases by way of the combination of the 1945 Ingalls-to-Thomas deed expressly passing title to Lot 10 and the vesting of

the reversionary interest in Bee Street in 1949. From there, it necessarily follows that the Thomases held title to the property abutting Gulf Avenue to the east bounded to the north by the centerline of what was Bee Street in 1949—all prior to the 1952 deed on which the Association rests its claim. And if Gulf Avenue was merely an easement, that encumbrance allowed the passing of title to the centerline of Gulf Avenue from the east for the same reasons described above in relation to the western side of part 1. The eastern side of part 1 also is owned by the Lehmanns.

### *The Reversion Possibility*

We know that Gulf Avenue in 1912 and 1944 was, at minimum, a dedication of common law easement on those plats, and if that is all that it was on both plats, we have explained why as abutting-land title, the land under that easement was always outside the chain of title for the 1952 deed. But we also recognize the existence of the theory that the 1944 replat or the operation of statutes that had been codified after 1912 may have converted the easement into a dedicated road that divested the dedicator of title to it and vested it with the Sarasota County. See, e.g., § 95.361, Fla. Stat. (2018); § 341.51, Fla. Stat. (1935); Pelican Creek, 243 So. 3d at 471. If that is true, then a reversionary interest that vested following the vacation of Gulf Avenue by the county would require consideration. See § 177.085, Fla. Stat. (1983) (governing reversionary interests in platted streets when Gulf Avenue was vacated).

In the possible conveyance of reversionary interests in Gulf Avenue prior to the 1952 Boyd-to-Association deed, we again consider the western and eastern segments of part 1. In 1946, by way of the Boyd-to-Thomas deed, the Thomases acquired title to the property abutting the western boundary of Gulf Avenue in a chain of title separate from the chain of title through which they acquired the Ingalls property to

- 23 -

the east.  This property expressly included the area to the west of Gulf Avenue south from the centerline of an extended Bee Street.  Therefore the titled property to the west of the western subportion of part 1 of Gulf Avenue was expressly conveyed in the 1946 deed and was not dependent on the vacation of Bee Street.  The 1945 deed coupled with the 1949 Bee Street reversion similarly titled all the adjacent land to the east of the eastern subportion of part 1.  It is therefore clear that title in the properties comprising the land on either side of the eastern and western boundaries of the Gulf Avenue parcel had vested fully in the Lehmann's predecessors in title—the Thomases—prior to the 1952 Boyd-to-Association deed either by way of express conveyance or the vesting of title through a reversionary interest following the vacation of Bee Street.  For the reversionary-interest consideration for the western part of part 1, then, this means only answering the question of whether titleholders of the adjacent land to the west of part 1, the Lehmanns stemming from the Boyd-Thomas chain of title, held the reversionary interest that vested in 1983 upon the vacation of Gulf Avenue or whether the Boyds otherwise passed that interest to the Association in 1952.  To the extent such a reversionary interest existed, nothing in our record shows that the Boyds expressly reserved it when they conveyed title to the Thomases in 1946, and absent more, that means the reversionary interest vested with the abutting-land titleholder to the west in 1983.  See § 177.085.  None of the deeds passing title after that point otherwise exclude such a reversionary interest, see § 177.085(1), nor has the Association shown that it sought to establish such a right after the 1983 vacation of Gulf Avenue pursuant to section 177.085(2).

The same reasoning also applies to the eastern side of part 1 for the Ingalls chain of title.  The caveat is that those in the Ingalls chain of title acquired vested

- 24 -

title to land east of part 1 with one additional step—that is when the reversionary interest in the southern half of Bee Street vested in 1949. But how title to the property between the southern edge and centerline of Bee Street to the east of part 1 vested is not as important as the fact that it happened no later than 1949, and there is, like its corresponding chain of title to the west, no evidence of an express reservation of that interest such that it could have reverted to anyone but the Lehmanns by way of the Ingalls-Thomas chain of title.

Thus, the Lehmanns correctly maintain that at the time that the 1952 deed purported to expressly convey title to the Gulf-Avenue-bounded property now at issue, the Boyds did not own any interest, expressly titled or reversionary, because it was already conveyed to the Thomases in the 1945 and 1946 deeds and the vesting of the Bee Street reversion no later than 1949. Each relevant deed expressly conveys any reversionary interests associated with the property conveyed. The Association argues that the portion of the disputed parcel bounded by Gulf Avenue was always unencumbered land owned by the Boyds until it was conveyed to the Association in 1952. This analysis fails to account for whether the titles to the surrounding lands that passed to the Thomases included the passing of any interests in the land that was Gulf Avenue other than by way of express inclusion. As we have explained, deeds before 1952 passed either full title or reversionary interests in that property.

### Conclusion

However one looks at it, the Lehmanns acquired title to what the trial court described as part 1 of the disputed parcel by virtue of the conveyance of title of the abutting lands or reversionary interests in part 1 prior to the Boyds' attempted conveyance of that land to the Association in 1952. Thus, the trial court erred when it

settled title to what it called part 1 based on a chain of title stemming from the 1952 Boyd-to-Association deed.  We reverse that portion of the final judgment, and the related order of the trial court directing the disbursement of funds from the court registry, and we affirm the remaining portions of the final judgment.  We remand with instructions to the trial court to enter a judgment settling title to the entirety of the disputed parcel in the Lehmanns.

Affirmed in part; reversed in part; remanded with instructions.

LaROSE, C.J., and BADALAMENTI, J., Concur.