IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED


CRAIG A. MARLOWE,

       Appellant,

 v.                                       Case No.  5D21-2407
                                             LT Case No. 2005-CA-0186

CITY OF ST. AUGUSTINE, KEVIN
VAN DYKE, MARCY A. VAN DYKE,
PAUL A. LEONARD AND SUSAN J.
LEONARD, TRUSTEES OF THE LEONARD
FAMILY REVOCABLE LIVING TRUST
DATED 23RD JANUARY, 2007, ET AL,

       Appellees.

_____/

Opinion filed July 14, 2023

Appeal from the Circuit Court
for St. Johns County,
Kenneth J. Janesk, Judge.

Michael J. Korn, of Korn & Zehmer,
PA, Jacksonville, for Appellant.

Isabelle C. Lopez, City Attorney, St.
Augustine, and Michael Cavendish,
of Cavendish Partners, P.A.,
Jacksonville, for Appellee, City of
Saint Augustine.

Rebecca Bowen Creed, of Creed & Gowdy, P.A., Jacksonville, and Bruce B. Humphrey and Lauren E. Howell, of Birchfield & Humphrey, Ponte Vedra Beach, for Appellees, Kevin Van Dyke and Marcy A. Van Dyke.

Gary S. Edinger, of Benjamin, Aaronson, Edinger & Patanzo, P.A., Gainesville, for Appellees, Paul A. Leonard and Susan J. Leonard, Trustees of the Leonard Family Revocable Living Trust Dated 23rd January, 2007.

LAMBERT, J.

Craig A. Marlowe appeals the final summary judgment entered against him and in favor of the City of St. Augustine (the "City") and Kevin and Marcy A. Van Dyke (the "Van Dykes"). Marlowe also appeals the order denying his motion for attorney's fees as a sanction against the City, filed pursuant to section 57.105(1), Florida Statutes (2020). We affirm, without further discussion, the order denying Marlowe's section 57.105(1) motion for attorney's fees. However, for the reasons that follow, we reverse the final summary judgment and remand for further proceedings consistent with this opinion.

2

## FACTS AND PROCEDURAL HISTORY

Marlowe initially filed the underlying lawsuit in 2005 against the owners of a single parcel of real property that is directly adjacent to real property owned by Marlowe in St. Augustine, Florida. What began as a dispute between two neighboring properties regarding riparian rights—based on Marlowe's allegation that the neighbors' dock obstructed and interfered with his riparian rights (particularly his right to build his own dock that accesses the navigable waters of Hospital Creek)—evolved into a complicated multiparty litigation involving several nearby properties, as well as disputes over the correct property boundaries and the historical ownership of the subject waterfront land dating back to Spanish colonial Florida in the early nineteenth century.

The City and the Van Dykes were later added as defendants because—though Marlowe did not assert any claim directly against them—they were found by the trial court, in an earlier order on a motion to dismiss filed by a different defendant, to be "indispensable parties" based on the possibility that a determination as to Marlowe's riparian rights might affect the riparian rights appurtenant to nearby waterfront properties owned by the City and the Van Dykes, respectively. Specifically, the City owns a thirty-foot right-of-way road called San Carlos Avenue, part of which borders the entire

3

northern boundary of Marlowe's property. San Carlos Avenue allegedly runs all the way to Hospital Creek, which is east of all of the separate tracts of land owned by the parties to the lawsuit. The Van Dykes own the waterfront real property immediately north of San Carlos Avenue, which separates their property from Marlowe's property. The other defendants in the initial stages of the underlying litigation[1] own property bordering the south of Marlowe's property.

During the earlier stages of this litigation, Marlowe had apparently obtained a title opinion that advised him that a dissolved corporation, St. Augustine North Beach and Toll Bridge Company ("Toll Bridge Company"), not Marlowe, owned the easternmost portion of what Marlowe had considered to be his own property. Marlowe would later acknowledge that, as a result, he discontinued actively pursuing resolution of the instant lawsuit for over seven years while he took steps that he believed were necessary to acquire the subject property from Toll Bridge Company via adverse possession.

In early 2017, Marlowe filed a fifth amended complaint in which he

---

[1] As of the date that the summary judgment was entered, the neighboring property and dock that were owned by the original defendants had come under ownership of the appellees Paul A. Leonard and Susan J. Leonard, Trustees of the Leonard Family Revocable Living Trust Dated 23rd January, 2007 ("the Leonards").

4

added Toll Bridge Company as a defendant, together with "any and all unknown parties claiming by, through, under and against St. Augustine North Beach & Toll Bridge Company who may be dead or alive, if said unknown parties may claim an interest through said company as spouses, heirs, devisees, grantees, or otherwise." Marlowe alleged for the first time that Toll Bridge Company owned all of the relevant waterfront land south of San Carlos Avenue other than the waterfront land owned by Marlowe and, thus, they were the only parties to the lawsuit who had riparian rights appurtenant to property south of San Carlos Avenue.

The following year, Marlowe filed a sixth amended complaint, which is the operative complaint. Marlowe revealed in this complaint that he had filed a separate lawsuit solely against Toll Bridge Company to quiet title and that, in November 2016, he obtained a default judgment against Toll Bridge Company. In that default judgment, the trial court found that when Marlowe acquired his property, Toll Bridge Company "may have had some right, title, and/or interest" in part of the property—specifically, the easternmost part of the property, nearest to Hospital Creek—but that Marlowe had become the true record titleholder of that property by virtue of adverse possession. The

5

default judgment further found that, as to "any or all accreted[2] lands that may be appurtenant to [the subject property acquired by Marlowe through adverse possession]," Marlowe "has the superior right to the accreted lands east of and appurtenant to [that subject property], subject to any other lawfully superior claims of adjacent owners to the accreted lands, if any."

Returning to the operative complaint in the underlying case, Marlowe asserted three causes of action requesting: (1) a declaration as to his riparian rights; (2) an injunction ordering the Leonards and another defendant[3] to remove their docks and restraining the defendants from further interfering with his riparian rights; and (3) quiet title and a declaration that Marlowe owns "the accreted property adjacent to his upland property," including a portion of allegedly accreted land claimed by the Leonards. Marlowe's claims in the underlying lawsuit depended upon Marlowe owning waterfront property and

---

[2] Black's Law Dictionary defines "accretion" as "[t]he gradual accumulation of land by natural forces, esp[ecially] as alluvium is added to land situated on the bank of a river or on the seashore." *Accretion, Black's Law Dictionary* (3d Pocket Ed. 2006).

[3] Between the initiation of the lawsuit and the filing of the sixth amended complaint, Marlowe had added as defendants the owners of the property immediately south of the Leonards' property, Christopher and Georgia C. Park (the "Parks"). The Parks also had a dock between their property and Hospital Creek, and Marlowe had alleged that both the Leonards' dock and the Parks' dock interfered with his riparian rights. The Parks have not participated in this appeal.

6

the riparian rights thereunto appertaining.

After the various parties filed their responses to this sixth amended complaint, the City filed a motion for summary judgment. The City argued that it, and not Marlowe or Toll Bridge Company, owned that easternmost part of the land claimed by Marlowe as his own, including all lands east of Marlowe's property to the waters of Hospital Creek. The City asserted that Marlowe could not have obtained that easternmost waterfront land because, when he purchased the property in 2004, the prior owner of Marlowe's property who sold it to him did not own that easternmost waterfront portion.

The City next asserted that Marlowe could not have obtained that easternmost waterfront property from Toll Bridge Company as a result of the default judgment because Toll Bridge Company did not own that land. As evidence in support of its summary judgment motion, the City filed, among other documents, records from the St. Johns County Property Appraiser identifying the easternmost waterfront portion of the land claimed by Marlowe (as well as the waterfront land separating from Hospital Creek all of the parcels south of Marlowe's property that are owned by other defendants)— i.e., the land that Marlowe argued had been owned by Toll Bridge Company and that he subsequently acquired through adverse possession—as Tax ID Parcel 1493300000 that is owned by the City.

7

The City thirdly argued that the default judgment obtained by Marlowe against Toll Bridge Company in the separate suit was void as a matter of law because it was obtained against a "non-existent" entity for which there are no records substantiating its "existence" later than the 1930s. The City reminded that since it was never joined as a party in Marlowe's separate suit against Toll Bridge Company, the default final judgment entered in that case had no res judicata effect against it.

The City also argued that while Toll Bridge Company operated a horse-drawn railway car over a nearby bridge in the 1910s and 1920s and that Toll Bridge Company had some deeded interest in some of the disputed land at that time, the land held by Toll Bridge Company was not waterfront property. Instead, the City argued that there had always been unsurveyed and unplatted sovereignly owned land between the privately owned property involved in this case and Hospital Creek.[4]

Lastly, the City asserted in its motion that Marlowe's claim to ownership of the disputed waterfront land is fatally flawed due to Marlowe's failure to

---

[4] The City did acknowledge that some new land had been formed along the subject waterfront stretch between the 1920s and the present—although the City asserted that it was formed by "dumped street sweepings during years of public works projects," as opposed to natural accretion—but the City maintained that there had always been some sovereign land between Hospital Creek and the privately owned land in that specific location.

8

plead the necessary element of "state action." According to the City, Marlowe was suing a sovereign entity for a determination of the sovereign's property rights but the trial court lacked subject matter jurisdiction over the claim because Marlowe failed to allege some "state action" by the City in the form of a taking or infringement upon Marlowe's private property rights.

Marlowe filed a response to the City's summary judgment motion. He asserted that in the early 1800s (prior to the United States acquiring Florida from Spain), Spain transferred the subject waterfront property into private ownership and that the surveyed and platted property owned by Toll Bridge Company was originally waterfront property—and was so as late as the 1920s. Therefore, Marlowe asserted that *all* of the unplatted land between Toll Bridge Company's original property and Hospital Creek is new land (whether formed by accretion or the City's filling activities), title to which was vested in Toll Bridge Company, as owner of the immediately upland property, and was now vested in him, as a result of the default final judgment entered in the separate suit finding adverse possession.

Marlowe further responded that the City's "state action" argument was unavailing because he had not sought judicial determination as to the City's ownership interest in any land; rather, the City was only added as a defendant because the trial court believed it to be an indispensable party due

9

to the possibility that a determination of Marlowe's riparian rights might affect the City's riparian rights arising from its neighboring waterfront property (i.e., San Carlos Avenue).

The Van Dykes filed their own motion for summary judgment. They joined in and adopted the arguments raised by the City in its summary judgment motion, explicitly emphasizing the argument that Marlowe possesses no riparian rights because he does not own the unplatted waterfront land between the easternmost platted property and Hospital Creek. The Van Dykes also argued that even if Marlowe were found to have riparian rights, any determination of Marlowe's riparian rights could not affect their riparian rights because their waterfront property and Marlowe's property are separated by San Carlos Avenue and thus not immediately adjacent. Lastly, the Van Dykes asserted that Marlowe's claim against them was time-barred under section 95.12, Florida Statutes (2004).

Lastly, Marlowe filed his own motion for partial summary judgment. He asked that the trial court hold that the eastern boundary of the subject platted property was originally waterfront and is, thus, riparian property and that he owns that easternmost portion of the platted property east of and appurtenant to his undisputed property, as well as "all accretions" east of his property.

Following a hearing on the three summary judgment motions, the trial court entered an order granting the City's and the Van Dykes' motions and denying Marlowe's motion and thereafter entered final summary judgment consistent with its order. The trial court first concluded that it lacked jurisdiction to determine ownership of the unplatted land because Marlowe failed to satisfy the "state action" requirement raised by the City, as he did not show or even allege any "deprivation, taking or infringement" by the City against his private property interests.

The trial court then proceeded to engage in "a complete analysis of the arguments." It first found that the summary judgment evidence did not support Marlowe's claim that the subject waterfront property was transferred into private ownership by Spain in the early 1800s. It instead concluded that the evidence established beyond a genuine dispute of material fact that the unplatted land east of Marlowe's property and separating the platted property from Hospital Creek was owned by the City as sovereign.

The trial court then addressed the default judgment obtained by Marlowe against Toll Bridge Company. The court did not find the default final judgment to be void, stating that it "[did] not wish to question or rewrite the history of another case," but concluded that it was "not inclined to give any further validity to a default decision against a company that stopped

11

existing decades before Marlowe even purchased the property."

As to the summary judgment in favor of the Van Dykes, the trial court found that even if Marlowe possessed riparian rights, under this court's decision in *Lake Conway Shores Homeowners Ass'n v. Driscoll*, 476 So. 2d 1306 (Fla. 5th DCA 1985), any determination as to those rights could not affect the Van Dykes' riparian rights because the Van Dykes' property does not "adjoin" Marlowe's property. The court also separately found that any riparian rights claim asserted by Marlowe against the Van Dykes was time-barred by section 95.12.

On appeal, Marlowe asserts numerous arguments in support of his request that this court reverse the summary judgment. Applying the de novo standard of review, *see Volusia Cnty. v. Aberdeen at Ormond Beach, L.P.*, 760 So. 2d 126, 130 (Fla. 2000), we find that four of Marlowe's arguments merit reversal of the final summary judgment.

I.

Marlowe argues that the trial court erred in finding that it lacked subject matter jurisdiction under the "state action" theory forwarded by the City. As previously indicated, the trial court explained that "state action" required that "there must be some deprivation, taking or infringement by the sovereign against a private citizen's property interest before that private citizen can

request [that the court] determine the sovereign's property rights." We reverse on this issue for two reasons.

First, Marlowe did not allege that the City took some affirmative action depriving or infringing against his property interests. Marlowe sought a declaration as to his own riparian rights, injunctive relief against the owners of two pieces of private property with two corresponding private docks, and to quiet title to the easternmost waterfront portion of what he claimed to be his own property. Marlowe did not allege, nor did his complaint appear to contemplate, that the City might have some claim to that land. Marlowe later added the City as a defendant in response to the trial court's finding, in an earlier order that it entered on a motion to dismiss filed by a prior defendant, that the City was an indispensable party because its riparian rights arising from the City's ownership of adjacent property might be affected by a determination of Marlowe's riparian rights, if any.

It was the City, in fact, that first suggested sovereign ownership of the property that Marlowe claimed to own. The City filed its motion for summary judgment and presented evidence in the form of records from the St. Johns County Property Appraiser that conflicted with Marlowe's evidence as to ownership. To the extent that the City's subsequent claim of ownership over land to which Marlowe sought to quiet title somehow transformed Marlowe's

13

claim into one seeking a determination of a sovereign's property rights, the City's claim of ownership in derogation of Marlowe's claim of ownership that he based on deeds and the default judgment against Toll Bridge Company would arguably satisfy the requirement of a "deprivation, taking, or infringement."

Second, the authorities cited by the trial court in its order do not support the City's "state action" argument. In *Blessey v. Walton County*, Case No. 3:18cv1415/MCR/CJK, 2018 WL 4291735 (N.D. Fla. Sept. 7, 2018), a beachfront property owner filed suit in federal court seeking a declaration that Florida's common law "customary use doctrine"—providing that "the public maintains a right to use the dry sand beach adjacent to the mean high-water line without interference by the property owner"—was unconstitutional. *Id.* at *1. To demonstrate the injury to his own property that was a prerequisite to obtaining the declaration that he sought, the plaintiff alleged only that the county was "intending" to assert "customary use" over all shoreline in the county, including shoreline owned by the plaintiff. *Id.* at *2.

The federal district court found that until the county *actually* asserted customary use over the plaintiff's property, his requested declaratory relief was premature. *Id.* at *4 ("Addressing a challenge to the common law doctrine with no state action and no concrete or immediate threat of injury

14

would require [the court] to make a constitutional determination based on hypothetical facts" and "in the abstract, which [the court] may not do." (citing *Gagliardi v. TJCV Land Tr.*, 889 F.3d 728, 733 (11th Cir. 2018); *In re Checking Acct. Overdraft Litig.*, 780 F.3d 1031, 1038 (11th Cir. 2015))).

*Blessey* is inapposite to the resolution of the instant case. Marlowe's complaint does not seek a declaration as to some future action that the City is considering, and Marlowe's complaint alleges an actual injury supporting his requested relief—that is, Marlowe alleges that his neighbors' docks interfere with his riparian rights. Therefore, unlike the plaintiff in *Blessey*, Marlowe is not seeking a declaration "in the abstract" or "based on hypothetical facts." *Gagliardi* is likewise inapposite to the instant case. *See Gagliardi*, 889 F.3d at 732–34 (holding that a property owner's lawsuit in federal court seeking declaratory and injunctive relief against a city related to the city's approval of the building of a religious center in a residential area became moot when other property owners sued the city in state court seeking to block that same project and successfully obtained for all similarly situated property owners the relief that the *Gagliardi* plaintiffs sought in federal court).

## II.

We next address the default judgment that Marlowe obtained against

15

Toll Bridge Company in the separate suit. Marlowe argued, among other things, that the default final judgment evidenced his interest in a portion of the subject real property. In granting summary judgment to the City, the trial court stopped short of declaring the default final judgment against Toll Bridge Company to be void. It did, however, express that it was "not inclined to give any further validity to a default decision against a company that stopped existing decades before Marlowe even purchased the property." To the extent that the trial court, in the context of a summary judgment, disregarded the default judgment because Toll Bridge Company was a long-dissolved Florida corporation, the court erred.

Marlowe served his quiet title complaint upon Toll Bridge Company by publication. "Service of process by publication may be made in any court on any party identified in [section 49.021, Florida Statutes], in any action or proceeding" to, *inter alia*, "quiet title or remove any encumbrance, lien, or cloud on the title to any real or personal property within the jurisdiction of the court." § 49.011(2), Fla. Stat. (2015).

"Where personal service of process or, if appropriate, service of process under [section] 48.194[5] cannot be had, service of process by

---

[5] Section 48.194, Florida Statutes (2015), controls personal service of process outside of the State of Florida.

16

publication may be had upon any party, natural or corporate, known or unknown, including," *inter alia*, "[a]ny corporation or other legal entity, whether its domicile be foreign, domestic, or unknown, and whether dissolved or existing, and, when described as such, the unknown assigns, successors in interest, trustees, or any other party claiming by, through, under, or against any named corporation or legal entity." § 49.021(2), Fla. Stat. (2015). This statute does not provide any time limit on how long a corporation may be dissolved and still be served by publication. Therefore, the trial court's premise in the proceeding below in which it apparently weighed and then summarily disregarded evidence of the default judgment because Toll Bridge Company has long been dissolved was incorrect.[6]

---

[6] To the extent that the City and the Van Dykes argue, and the trial court implied, that the default judgment could be declared void based on lack of personal jurisdiction over Toll Bridge Company, actions that are in rem or quasi in rem, which would include Marlowe's quiet title action against Toll Bridge Company, do not require the establishment of personal jurisdiction over a defendant landowner. *See Hinton v. Gold*, 813 So. 2d 1057, 1059 (Fla. 4th DCA 2002) (citing *McDaniel v. McElvy*, 108 So. 820, 830 (Fla. 1926); *T.J.K. v. N.B.*, 237 So. 2d 592, 594 (Fla. 4th DCA 1970); *Wolf v. Indus. Guar. Bancorp.*, 281 So. 2d 598, 599 (Fla. 3d DCA 1973)); *Miccosukee Tribe of Indians of Fla. v. Dep't of Envtl. Prot. ex rel Bd. of Trs. of the Int. Imp. Trust Fund*, 78 So. 3d 31, 33 (Fla. 2d DCA 2011). However, a trial court obtains jurisdiction in such actions "only after the plaintiff wishing to bring suit complies with the requirements of due process," which requires "that the defendant be given fair notice and a reasonable opportunity to be heard before a judgment is rendered." *Hinton*, 813 So. 2d at 1059–60 (citing *Ryan's Furniture Exch. v. McNair*, 162 So. 483, 487 (Fla. 1935); *Wyatt v. Haese*, 649 So. 2d 905, 907–08 (Fla. 4th DCA 1995)). Service of process

Neither the Van Dykes nor the City presented any evidence or argument that Marlowe failed to comply with Florida's service of process by publication statutes, nor did the trial court make any such finding. Furthermore, to the extent that the trial court found that the default judgment was unenforceable because, as a matter of law, the City, and not Toll Bridge Company, owned the subject property, we conclude that there are genuine disputes of material fact that preclude summary judgment. *See* Fla. R. Civ. P. 1.510(a) (requiring a showing "that there is no genuine dispute as to any material fact" and that "the movant is entitled to judgment as a matter of law" before a summary judgment may be granted).

At the summary judgment hearing, both Marlowe and the City presented and relied upon the original 1924 plat map of the development area encompassing all of the parties' subject properties. The plat map identified Toll Bridge Company as the owner of the proposed development. Marlowe presented a chain of deeds arguably supporting Toll Bridge Company's ownership of the subject property, including the easternmost

---

by publication, when effected in compliance with statutory requirements, satisfies this due process requirement for in rem jurisdiction. *See, e.g.*, *Honegger v. Coastal Fertilizer & Supply, Inc.*, 712 So. 2d 1161, 1162 (Fla. 2d DCA 1998) (citing *Bedford Comput. Corp. v. Graphic Press, Inc.*, 484 So. 2d 1225, 1227 (Fla. 1986); *Est. of Bobinger v. Deltona Corp.*, 563 So. 2d 739, 748 (Fla. 2d DCA 1990)).

portion of the surveyed and platted property in dispute.

That easternmost portion of the surveyed and platted property was dedicated as a roadway in the 1924 plat map. However, the road was never built, and the dedicated right-of-way was expressly abandoned by the City by ordinance in 1966. Because Toll Bridge Company may arguably have held title to the entire dedicated-then-abandoned roadway,[7] comprising the easternmost boundary of the surveyed and platted property, this evidence materially conflicted with the evidence presented by the City through the St. Johns County Property Appraiser records that attributed ownership of the subject waterfront property to the City. The City argued that this showed its ownership of the unplatted land between the platted property and Hospital Creek, which appears to include the eastern one-half of the dedicated-then-abandoned roadway comprising the eastern boundary of the platted property. This genuine dispute of material fact as to whether the City or Toll Bridge Company owned the easternmost portion of the platted property

---

[7] *See Pelican Creek Homeowners, LLC v. Pulverenti*, 243 So. 3d 467, 470–71 (Fla. 5th DCA 2018); *Lehmann v. Cocoanut Bayou Ass'n*, 269 So. 3d 599, 608–10 (Fla. 2d DCA 2019). We reject, without further discussion, the City's and the Van Dykes' argument that section 177.085(2), Florida Statutes (1972), undermines Marlowe's theory as to Toll Bridge Company's ownership of the easternmost portion of the subject platted property. *See Pelican Creek Homeowners*, 243 So. 3d at 472–73; *Lehmann*, 269 So. 3d at 613–14.

when Marlowe obtained the default judgment against Toll Bridge Company in adverse possession was not resolvable through summary judgment.

Second, while the City maintains that there have always been unsurveyed and unplatted sovereign lands between the subject platted property and the waters of Hospital Creek, Marlowe asserted that the platted property (particularly, the dedicated-then-abandoned roadway comprising the eastern boundary of the platted property) was originally waterfront property and that all of the unplatted waterfront land to the east was newly formed since the dedication of the plat in 1924. The summary judgment evidence on this issue is conflicting, with some maps from the 1920s depicting a large and undefined space between the creek and the platted property, with other maps from the 1920s suggestive that the creek's waters ran closer to the platted property. One map also depicted the waters of the creek bordering and slightly overlapping the platted property.

This disputed fact bears upon ownership of all of the land between the platted property and Hospital Creek. If the platted property was waterfront property, then the upland owner of the easternmost portion of platted property could have arguably held title to the newly formed land adjacent thereto, whether that land was formed by accretion or by the City's filing activities. *Compare Walton Cnty. v. Stop Beach Renourishment, Inc.*, 998

20

So. 2d 1102, 1111–12 (Fla. 2008) (recognizing the riparian/littoral[8] right to ownership of accretions), *with* § 253.12(9), Fla. Stat. (1993) (granting, under certain circumstances, the state's right, title, and interest in tidally influenced land that has been created by fill before July 1, 1975, to "the landowner having record or other title to all or a portion thereof or to the lands immediately upland thereof and its successors in interest"). This Court need not, and we therefore do not, reach the hypothetical issue of whether Toll Bridge Company, *if* it owned originally waterfront property and *if* the new land was formed by the City's filling activities, could have obtained title to the newly formed land pursuant to section 253.12(9). The genuinely disputed factual issues of who owned the easternmost portion of the platted property and whether the platted property was originally waterfront property—not to mention the unsettled issue of whether the newly formed land was created by accretion, by fill, or by a combination of both—render erroneous the trial court's summary judgment.

III.

Turning to the summary judgment entered in favor of the Van Dykes

---

[8] "Riparian" technically refers to rights appurtenant to ownership of property abutting a river or stream, while "littoral" refers to rights appurtenant to ownership of property abutting an ocean, sea, or lake. Nevertheless, Florida case law and the Florida Statutes often use the terms interchangeably. *See Stop Beach Renourishment*, 998 So. 2d at 1105 n.3.

on Marlowe's claim of riparian rights, the trial court, citing to this court's decision in *Lake Conway Shores*, determined that whatever may be the riparian rights of Marlowe, they could not affect the Van Dykes' riparian rights because the Van Dykes' property was not directly adjacent to Marlowe's property. We reverse.

*Lake Conway Shores* does not support this conclusion that the determination of a waterfront property owner's riparian rights could only possibly affect the riparian rights of immediately adjacent waterfront property owners. *See* 476 So. 2d 1306. The only relevant holding from *Lake Conway Shores*, which is not dispositive of the instant parties' summary judgment motions, is that using the "prolongation of property line" method (i.e., extending the interested parties' property lines into the navigable waters to determine the areas in which the parties may exercise their respective riparian rights) cannot be used if it eviscerates another waterfront property owner's riparian or littoral rights. *See id.* at 1308–09. Here, a "riparian survey" filed by Marlowe similarly used the "prolongation of property line" method to draw "riparian boundaries," but the "riparian lane" proposed in the survey veered toward and even cut across the Van Dykes' property.

The Florida Supreme Court's opinion in *Hayes v. Bowman*, 91 So. 2d 795 (Fla. 1957), is instructive. The parties in that case disputed the proper

22

location of riparian or littoral lanes. *Id.* at 798. Each party used different angles to prolong their property line into an available channel. *Id.* The Florida Supreme Court recognized the bedrock common law riparian rights of "an unobstructed view" and "access," holding that

> the common law riparian rights to an unobstructed view and access to the Channel over the foreshore across the waters toward the Channel must be recognized over an area as near "as practicable" in the direction of the Channel so as to distribute equitably the submerged lands between the upland and the Channel.

*Id.* at 801.

The court, however, observed the difficulty at times in protecting and establishing these rights, holding:

> It is absolutely impossible to formulate a mathematical or geometrical rule that can be applied to all situations of this nature. The angles (direction) of side lines of lots bordering navigable waters are limited only by the number of points on a compass rose. Seldom, if ever, is the thread of a channel exactly or even approximately parallel to the shoreline of the mainland. These two conditions make the mathematical or geometrical certainly [sic] implicit in the rules recommended by the contesting parties literally impossible. We must therefore search elsewhere for a solution to this admittedly difficult problem.

*Id.*

In other words, the court appeared to appreciate that when determining

23

riparian rights, there is no exclusive right to any geometrically drawn "riparian lane."  In some circumstances, such as with a relatively straight shoreline and consistently straight navigable channel, those rights might *look like* or take the shape of straight "lanes" with docks, but that is often not true:

> Riparian rights do not necessarily extend into the waters according to upland boundaries nor do such rights under all conditions extend at right angles to the shore line.  Our own precedents are completely inconsistent with the appellees' view that such rights extend over an area measured by lines at right angles to the Channel.  It should be borne in mind that littoral or riparian rights are appurtenances to ownership of the uplands.  They are not founded on ownership of the submerged lands.  It is for this reason, among others that we cannot define the area within which the rights are to be enjoyed with mathematical exactitude or by a metes and bounds description.

*Id.* at 802.

From these principles, we conclude that the fact that the Van Dykes' property is not directly adjacent to Marlowe's property does not show, beyond a genuine dispute of material fact, that a determination of Marlowe's riparian rights could not possibly affect the Van Dykes' own riparian rights. The trial court, therefore, erred in entering summary judgment in favor of the Van Dykes on this basis.

The trial court also held that Marlowe's claim against the Van Dykes to set the riparian rights was barred by the seven-year statute of limitations

24

codified in section 95.12. This statute provides, in its entirety:

> No action to recover real property or its possession shall be maintained unless the person seeking recovery or the person's ancestor, predecessor, or grantor was seized or possessed of the property within 7 years before the commencement of the action.

§ 95.12, Fla. Stat. (2004).

As such, the plain language of section 95.12 applies to actions involving the recovery of real property or its possession. Here, Marlowe did not assert a claim against the Van Dykes seeking the recovery or possession of real property; rather, as indicated, the Van Dykes are joined because a determination as to Marlowe's riparian rights could affect the Van Dykes riparian rights arising from their nearby waterfront property. We find that the trial court erred in ruling that Marlowe's claim against the Van Dykes was time-barred by section 95.12.

In summary, we reverse the final summary judgment entered in favor of the City and the Van Dykes, and we remand for further proceedings consistent with this opinion.

REVERSED and REMANDED.

WALLIS and HARRIS, JJ., concur.